(No. 29484.— )
Martin Moneta, Appellant, *vs.* Julia Hoinacki *et al.,*
Appellees.

*Opinion filed May 21, 1946.*

MAXIMILIAN J. ST. GEORGE, of Chicago, for appellant.

SHULMAN, SHULMAN & ABRAMS, and MARTIN S. GORDON, (MEYER ABRAMS, of counsel,) all of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

On January 29, 1943, the plaintiff, Martin Moneta, filed a complaint in the superior court of Cook county against Julia Hoinacki, Max Ryncarz, and others, and thereafter an amended complaint, a supplement to the original complaint, a second amended complaint and, on January 11, 1944, his third amended complaint and supplement. The relief sought was to set aside certain deeds executed in 1931, three conveying property in California to his wife, now deceased, and one conveyance, in 1933, to Julia Hoinacki; to impress one parcel of property in Chicago purchased by Julia Hoinacki with a trust in his favor, to compel her to convey the premises to him, to account for the rents since its purchase, and to render an accounting with respect to two other parcels of real estate in Chicago and one in Wisconsin. Plaintiff alleged that he was insane at the time of the conveyances to his wife, and that his

signature on the deed to defendant was forged. The principal defendant, Julia Hoinacki, answered, denying the material allegations of plaintiff's pleading. Answers were also interposed by other defendants. The cause was referred to a master in chancery. After extended hearings, he filed his report finding that plaintiff had failed to prove the material allegations of his final complaint, and recommended its dismissal. Plaintiff's objections to the report, ordered to stand as exceptions, were overruled. The chancellor confirmed the master's report and, on May 25, 1945, dismissed the cause for the want of equity, at plaintiff's costs. An appeal prosecuted by plaintiff to the Appellate Court for the First District has been transferred to this court, a freehold being involved.

Plaintiff was born in Poland, then a part of Austria, in 1869. He came to this country in 1893, resided first in Nebraska and, later, came to Chicago. In 1907, he married Antonina Kiolbassa, and thereafter they lived in her residence at 1620 Morse Avenue, one of the eight properties involved in the present controversy. A year earlier, plaintiff purchased property at 1064 Milwaukee Avenue where he operated a photographic studio and, later, a motion-picture theater. About 1912, Julia Hoinacki, (hereafter referred to as defendant) a niece of plaintiff's wife, then about seventeen years of age, came to Chicago from her home in Wisconsin to live in her aunt's household. For several years, defendant was employed by plaintiff, and received a modest salary in addition to her room and board. Subsequently, she operated a beauty shop. Plaintiff, his wife, and defendant lived together as a family until 1927 when plaintiff and his wife moved to California. Plaintiff made several trips back to Chicago, but continued to reside in California until 1932. During this period, defendant lived in Chicago. While in California, plaintiff bought three parcels of property, referred to for convenience as parcels Nos. 1, 2 and 3. Title was taken in the name of

himself and his wife as joint tenants to parcels Nos. 1 and 2, purchased in 1927, and to parcel No. 3, purchased in 1929. In June, 1929, plaintiff returned to Chicago, and, on June 25, he and his wife sold the property at 1064 Milwaukee avenue and, as a part of the purchase price, took back a mortgage securing a note for $17,500. The purchaser defaulted in the payment of his indebtedness, and foreclosure proceedings were instituted in the circuit court of Cook county in 1930. The foreclosure action proceeded to the point of the issuance of a master's certificate to plaintiff, which was held by Marion G. Kudlick, the attorney then representing him, as security for moneys advanced, costs, and attorney's fees, aggregating $1040. In due course, a master's deed issued, and plaintiff and his wife executed their note for $1040 to Kudlick, dated August 15, 1932, secured by a trust deed, dated the same day. At their request, defendant paid Kudlick the sums due him out of her own funds on January 2·and February 13, 1936. In the meantime, on January 23, 1933, plaintiff and his wife conveyed the property to defendant. According to defendant, this conveyance was made to her in consideration of services performed for plaintiff and his wife, and because of their inability to pay either the taxes on the property or the mortgage indebtedness to Kudlick. Plaintiff contends that the signature on the deed to defendant was forged and, although the issue was not raised by the pleadings, also contended upon the master's hearing that he was insane at the time. Defendant, in turn, sold the premises for $5100. Out of the purchase price, she paid back taxes amounting to approximately $1600, and $600 to satisfy a judgment rendered against plaintiff. The net proceeds of the sale paid to defendant amounted to $2301.06. It is to be noted, however, that she had previously paid Kudlick $1040 and, in addition, had made substantial expenditures for repairs to the property. In the Appellate Court, on plaintiff's motion, the appeal was dis-

missed as to the subsequent grantee, its mortgagee, and the trustee under the trust deed.

Reference will now be made to the California properties. On December 29, 1931, plaintiff conveyed parcel No. 1 to his wife as her separate property. More than eighteen months afterwards, Antonina Moneta, plaintiff's wife, conveyed the property to Antoni Rybicki and his wife, subject to an unpaid mortgage indebtedness of $4600. Plaintiff also conveyed parcel No. 2 on December 29, 1931, to his wife. This deed recites, as did the deed to parcel No. 1, that it was executed to effectuate the mutual agreement of the parties that the property become vested in the grantee as her sole and separate property. Plaintiff testified that he did not remember signing these deeds because of his condition. More than five years afterwards, on February 10, 1937, plaintiff's wife sold parcel No. 2, subject to taxes and an incumbrance, receiving approximately $6000 from the sale. The third parcel of property in California, consisting of three lots, was conveyed on June 20, 1931, by plaintiff and his wife to a nominee who reconveyed the property to plaintiff's wife, and on January 23, 1934, the latter conveyed parcel No. 3 to defendant. He testified that he did not remember signing these deeds owing to illness. Defendant testified that her aunt gave her these lots because of her inability to meet the taxes, and preferred that defendant acquire them, rather than to lose the property to a stranger.

The property at 2450 North Hamlin Avenue, Chicago, must be considered in connection with the disposition of parcel No. 2 of the California properties. November 9, 1937, defendant purchased this property which is improved with a two-flat building. Upon its purchase, defendant, plaintiff, and his wife moved into the first flat and defendant rented the second flat to a tenant. From the evidence it appears that defendant had, at various times, advanced to plaintiff, at his request, sums of money in excess of

$5000 up to the year 1937 and that, subsequent to the return of himself and his wife from California in 1932, they lived with defendant, who administered to their wants. After his wife's death, plaintiff continued to reside with defendant in the same apartment. Of the purchase price of $8000 for the property on North Hamlin avenue, plaintiff's wife paid defendant $5000 from the proceeds of the sale of parcel No. 2 of the California property in consideration of the advancements to plaintiff and herself and, also, the care defendant was then bestowing upon them. The balance of $3000 was paid by defendant from her own funds and money borrowed from her sister and brother-in-law. Plaintiff claims he is the real owner of the Hamlin avenue property.

Plaintiff's wife, at the time of their marriage in 1907, owned the property at 1620 Morse Avenue, and she and plaintiff lived there until 1927. In 1931, they were admittedly indebted to defendant and Max Ryncarz, a co-defendant, in the amount of about $2000. August 31, 1931, plaintiff's wife executed a warranty deed to defendant and Ryncarz, as joint tenants, to the property on Morse avenue. Subsequently, plaintiff's wife executed a second warranty deed to the grantees. Plaintiff also signed this deed. His theory is that these deeds were, in reality, a mortgage. Defendant, on the other hand, averred and submitted evidence to the effect that the deeds were given in payment of the indebtedness described. In 1937, defendant and Ryncarz sold the property, realizing $1900. Plaintiff asked an accounting for any sums received by them in excess of $2000.

The property at 4324 Milwaukee avenue must be considered in connection with the disposition of parcel No. 1 of the California property. On July 13, 1933, Antoni Rybicki conveyed the property on Milwaukee avenue to defendant. This property she acquired in exchange for parcel No. 1 of the California property which Rybicki had

purchased from Antonina Moneta, as previously recounted. The property on Milwaukee avenue was deeded to defendant in consideration of money advanced to her by plaintiff and his wife for the care which she had given them. In 1937, defendant conveyed this property to the Polish National Alliance, in lieu of foreclosure, receiving therefrom $200.

Plaintiff's wife owned a three-fifths interest in a farm of 260 acres near Stevens Point, Wisconsin, the other two fifths being owned by a person not involved in this litigation. The farm had been sold ·for taxes. Prior to 1941, plaintiff's wife deeded her three-fifths interest in the land to defendant, being unable to maintain the farm and, thereafter, defendant and. the co-owner redeemed the property from taxes for the sum of $970. In addition, defendant paid attorney's fees incident to the matter. The property was sold in 1941 for $2500.

The principal contention urged by plaintiff in support of a reversal is his alleged insanity at the time of the execution of the deeds and the consummation of the other transactions described, insisting that he was unable to understand the nature of the business or the acts he performed in the execution and delivery of any deeds; that there was no consideration for any of the deeds, and that an accounting should be ordered. No useful purpose can be served by narrating the detailed testimony of the plaintiff and the witnesses who testified in his behalf. His contention, in substance, is that he became insane in June, 1931, and did not regain his sanity until shortly after his wife's death on March 24, 1941. The causal connection between the two is not explained. The only testimony relative to plaintiff's mental condition while he was in California in 1931 and the early part of 1932 is the testimony of himself and defendant. An examination of all of the evidence heard by the master discloses a vivid recollection by plaintiff of events, persons, and business affairs

generally during the time he now claims he was insane. According to plaintiff, he became ill in the summer of 1931, and his condition grew progressively worse. Psychopathic proceedings were instituted in the superior court of Los Angeles county. A psychopathic parole officer stated, among other things, " Patient is fairly well oriented. * * * His conversation is rational and coherent." November 2, 1931, an order of parole was entered in the matter of Martin Moneta, an alleged insane person, in cause No. 34399, in the superior court of California in and for the county of Los Angeles, the order reciting, "Whereupon the Court finds that person is mentally sick and bordering on insanity, but not dangerously insane." The court ordered plaintiff committed to the custody of a psychopathic probation officer and directed that he be allowed to remain in his home. On November 10, an order was entered committing him to Baldy View Sanitarium; on December 23, another order was entered committing him to the custody of a probation officer and allowing him to remain in his home. February 21, 1932, an order was entered, again committing him to the sanitarium and, on March 1, 1932, he was committed to the care of a probation officer once more, and allowed to remain in his home. In the interim, on November 4, 1931, two days after the entry of the original order, defendant, in response to a request by telegram from the minister of the church plaintiff and his wife attended in California, went west and remained with them until March, 1932, when she brought them back to Chicago. At this time, plaintiff and his wife lived with defendant at the residence of Max Ryncarz in Norwood Park. The report of a psychopathic parole officer, dated July 28, 1932, to the judge of the superior court of Los Angeles, states that plaintiff had left the jurisdiction of the court, and recommended dismissal of the case. Upon this recommendation, the case was dismissed on August 4, 1932. November 23, 1943, after plaintiff's sec-

ond amended complaint had been stricken in this cause, and without notice to defendant, he procured the entry of an order in the superior court of Los Angeles county finding that he had' fully recovered, as evidenced by the affidavits of two physicians in Chicago, and was adjudged competent and ordered discharged from his commitment and restored to all his rights and privileges as a sane person.

The record in the superior court of Los Angeles county contains no finding of insanity in the proceedings narrated, but merely a finding that plaintiff was bordering on insanity. Indeed, plaintiff concedes that the detention proceedings did not constitute an adjudication of insanity. In a parallel situation, in *Carroll* v. *Carroll*, 16 Cal. 2d 761, the court said: "Upon the hearing it was found that plaintiff was 'mentally sick and bordering on insanity, but not dangerously insane, and plaintiff was thereupon committed to the custody of the psychopathic probation officer under the provisions of section 2167b of the Political Code and was placed in Casa del Mar Sanitarium. * * * It appears well settled that such proceedings are summary proceedings instituted for a particular purpose and that 'insanity or incapacity is not "judicially determined" within the meaning of section 40 of the Civil Code' by a commitment in such proceedings instituted under the sections of the Political Code." *Fetterley* v. *Randall*, 92 Cal. App. 411, is to the same effect, namely, that proceedings of the character described do not have the effect of establishing insanity as a matter of law. An analogous situation was presented in this court in *Lewandowski* v. *Zuzak*, 305 Ill. 612, a will contest where the testator's mental soundness was challenged. This court observed, "The proceeding for the commitment of the testator to the hospital for the insane was upon a different issue from that in this case, and the certificate of the physicians was given to the jury without any opportunity for cross-examination by the appellants. In *Keely* v. *Moore*, 196 U. S. 38, where a similar certifi-

cate of two physicians was offered in evidence and excluded, the court said: 'These were properly excluded, not only because 'they were unsworn testimony but because they were given in a different proceeding and upon a different issue. Thomson may have been insane to the extent of being dangerous if set at liberty and yet may have had sufficient mental capacity to make a will, to enter into contracts, transact business, and be a witness.' "

Friends and relatives who visited plaintiff subsequent to his return to Chicago in 1932 testified in detail, expressing the opinion he was then insane and unable to transact business. Of these, one was an octogenarian, a long-time friend of plaintiff; the second, a friend of thirty-five years' standing who expressed the opinion plaintiff was insane until the death of his wife; a carpenter contractor; a tavern keeper, his wife's nephew, who had known plaintiff forty years, and his wife, the former stating that after his aunt's death plaintiff's condition gradually improved; and the sixth, a physician, who saw him infrequently. A milkman's testimony is to the effect that he thought plaintiff was troubled but not insane. None of the witnesses was present when any of the conveyances were executed. On the other hand, Walter M. Murray, a lawyer, who visited plaintiff at this time with regard to the collection of a note he had signed in California, testified that plaintiff knew about the note, admitted that he owed the money and regretted his inability to pay it. Murray expressed the opinion that plaintiff was sane. In addition to Murray's testimony, Kudlick, an attorney who had known him for forty years, testified that plaintiff gave him three notes and a trust deed in payment of his fees in August, 1932, and that, at plaintiff's request, he reduced his fees and took the notes and mortgage in payment. Plaintiff's participation in this transaction was not that of an insane person, and Kudlick gave his opinion that plaintiff was then sane. Andrew F. Kucharski, many years at the bar,

who had known the plaintiff for forty years and acted as his attorney in several matters, testified that he prepared documents for plaintiff in 1933, and that plaintiff was sane. In addition to the testimony of these three lawyers, and the testimony of a woman and defendant's brother-in-law, we find letters plaintiff wrote to defendant in May, June, and July, 1931, at the time when he alleged in his sworn pleadings that he was insane. Recourse to these communications discloses that plaintiff had an adequate grasp of property and financial matters relating to himself, and also exhibited much concern for the condition of his wife who, it appears, was ten years older than himself, and in frail health at the time.

Dr. Joseph Konopa, plaintiff's physician, testified that he saw plaintiff two or three times in Norwood Park and two or three times on Milwaukee avenue, and that his condition improved from 1932. Plaintiff informed him that while he was in California he encountered difficulty with his real estate in Chicago, and returned to make inquiry. He also told him of his property in California. The doctor testified that he did not consider plaintiff's mental condition serious, or else he would have called in a psychiatrist, but that this never appeared necessary. He did express the opinion that plaintiff was insane at certain times on certain matters, but not at all times. He added that if a man remembered in 1942 what took place in 1932, then, at the time of the events in 1932, he must have known what was happening.

We are constrained to observe that the factual situation presented is almost one of a posthumous claim of insanity. Nearly twelve years passed between the time of the execution of the deeds to the property in California and the day plaintiff filed his original complaint in this cause. Moreover, during the period of nearly ten years after these conveyances plaintiff's wife made no complaint, either legally or otherwise, that she was overreached by de-

fendant in the transactions now assailed. The conclusion is impelling that the insanity belatedly alleged to have been present in 1931 is, to put it charitably, an afterthought. Plaintiff's contention that he was mentally incompetent at all times from June, 1931, to shortly after the death of his wife in March, 1941, is simply without a reasonable basis in the evidence. As a matter of law, plaintiff was not insane on December 29, 1931, or at the time of any of the other transactions attacked by him. And the master's finding, confirmed by the chancellor, that the proof fails to show him insane, as a matter of fact, when he executed the deeds in controversy, is abundantly supported by the evidence.

Plaintiff, however, invokes familiar rules, among others, that a higher degree of mental capacity is required to make a valid deed than is essential to enable a testator to make a will. (*Greene* v. *Maxwell,* 251 Ill. 335.) Again, to sustain a deed, the grantor must have sufficient mental capacity to transact ordinary business, and this requires that he have mental ability to cope with an antagonist and to understand and protect his own interests. (*Greene* v. *Maxwell,* 251 Ill. 335.) The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand the nature and effect of the business in which he is engaged and is exercising his own will, his deed is valid. (*McGlaughlin* v. *Pickerel,* 381 Ill. 574.) Even partial impairment of mental faculties and disease are not necessarily sufficient to set aside a deed where it appears that the grantor had sufficient mental capacity to comprehend the nature of the transaction and to protect his own interests. (*Redmon* v. *Borah,* 382 Ill. 610; *Essary* v. *Marvel,* 274 Ill. 576.) The record is barren of proof that, in 1931, when the conveyances were made, plaintiff was incapacitated to such an extent as to render the conveyances voidable in the light of the fore-

going principles. Recourse to the evidence discloses that no one testified to plaintiff's state of mind in 1931 when he conveyed his interest in several parcels of property to his wife. The testimony of plaintiff's witnesses relates to their observations subsequent to these conveyances. It may be conceded that plaintiff was subject to melancholia, that his memory was poor, that he was irascible, intermittently despondent, and even that he was eccentric in the extreme. Such a concession cannot avail him at this late date to prove that he was insane in 1931.

After the decree of May 25, 1945, had been entered, plaintiff presented a motion seeking leave to file an amendment to his third amended complaint to charge his insanity at the time of the execution of the deed to defendant conveying the property at 1064 Milwaukee Avenue and, further, that a fiduciary relation then existed between plaintiff and defendant, and that the execution of the deed was a violation by defendant of the trust and confidence reposed in her by him. On June 20, 1945, this motion was denied. The allowance of material amendments after the evidence has been closed is a matter resting largely in the discretion of the chancellor, and his ruling thereon will not be disturbed on review except in cases of clear abuse. (*McGlaughlin* v. *Pickerel,* 381 Ill. 574.) Section 46 of the Civil Practice Act, (Ill. Rev. Stat. 1945, chap. 110, par. 170,) allowing amendments at any time before judgment in a civil action on such terms as are just and reasonable, and for amendment of a pleading, before or after judgment, to conform the pleadings to the proof, does not aid plaintiff. Courts apply these provisions to the end that justice may be done, but the materiality of a proposed amendment to the evidence already introduced must be apparent. Plaintiff's motion does not present a question of conforming the pleadings to the proof, for the meager facts alleged in his motion do not disclose the existence of a fiduciary relationship between defendant and plaintiff.

Plaintiff did not convey any of the eight parcels of property involved to defendant, with the single exception of the property at 1064 Milwaukee Avenue. Except as to an accounting by the defendant, Julia Hoinacki, this transaction is no longer in issue because plaintiff dismissed the subsequent grantee and the latter's mortgagee from the cause upon the present appeal. The mere fact that defendant was related to plaintiff's wife did not establish a fiduciary relationship between her and plaintiff. Indeed, there is no proof, as a matter of fact, that such a relationship existed between them. Special confidence and trust on one side and domination and influence on the other must be proved in order to sustain a finding that a fiduciary relation existed. (*Dyblie* v. *Dyblie,* 389 Ill. 326.) A fiduciary relationship does not arise out of the kinship of the parties alone, and where one seeks to establish such a relationship, the proof must be clear and convincing and so strong as to lead unmistakably to but one conclusion. (*Finney* v. *White,* 389 Ill. 374; *Johnson* v. *Lane,* 369 Ill. 135.) Such proof is wanting in the present case. Much of plaintiff's argument is devoted to the proposition that where a fiduciary relationship exists, it rests upon the fiduciary to show the fairness of the transaction. Apart from the fact that no such relationship obtained between plaintiff and defendant, the rule is inapplicable, in any event, since the presumption of undue influence from the fiduciary relation does not apply to conveyances from husband to wife. (*Nickoloff* v. *Nickoloff,* 384 Ill. 377.) Where property is conveyed to the wife, as in the present case, even though the husband furnishes all of the purchase price, the presumption obtains that the conveyance is made as an absolute gift. To rebut this presumption, it must appear that there was an obligation on her part to hold the property in trust for him. (*Delfosse* v. *Delfosse,* 287 Ill. 251.) Manifestly, he cannot, more than a decade later, and after his wife has died, successfully claim the existence of such

a relationship upon the factual situation here. The court properly denied plaintiff's motion for leave to amend his complaint.

Plaintiff has not argued the question of the alleged forgery of his signature to the deed conveying title to defendant to the property at 1064 Milwaukee Avenue, and this charge is, in consequence, deemed abandoned. It may well be noted, however, the rule is established that where, as here, a deed has been acknowledged and contains the certificate of an officer authorized by law to take acknowledgments, the certificate of such officer showing that the deed was executed and acknowledged by the grantor cannot be overcome or impeached by the testimony of the grantor, alone. *Holmes* v. *First Union Trust and Savings Bank,* 362 Ill. 44.

In summary, with the exception of the property at 1064 Milwaukee avenue, all of the conveyances in question were made by plaintiff to his wife. Plaintiff's wife, to whom the property was conveyed, enjoyed the right to dispose of it as she pleased. The Wisconsin property was owned by her, and not by plaintiff. She conveyed this property to defendant and, under the law of Wisconsin, he had no dower right therein. When all the circumstances and facts are considered, the conclusion is inescapable that plaintiff is not entitled to an accounting with respect to any of the transactions involving the eight parcels of real estate, including the 1064 Milwaukee Avenue property.

From the middle of the year 1936 until March, 1941, when plaintiff's wife died, defendant received approximately fifty-eight dollars per month for the support and care of plaintiff and his wife from the Cook county Bureau of Public Welfare. After her aunt's death, she received twenty-nine dollars per month for plaintiff, and this money was used for his support until June, 1942, when he received his relief check and cashed it himself. Subsequently, differ-

ences having arisen between plaintiff and defendant, he has received the checks, and retained the proceeds. Without narrating the testimony, we deem it sufficient to say that the evidence amply sustains the master's conclusion that defendant used the proceeds of the checks for the support, care and maintenance of plaintiff and his wife, and that all of the money so received was required to maintain and care for them. Accordingly, an accounting is unnecessary.

The decree of the superior court of Cook county is right, and it is affirmed.

*Decree affirmed.*