(No. 36005.—

CARL C. LANDAU *et al.*, Appellants, *vs.* WILBUR E. LANDAU
*et al.*, Appellees.

*Opinion filed October 31, 1960.*

HAROLD F. TRAPP, of Lincoln, for appellants.

DANIEL ANDERSON, of Chicago, and ARTHUR B. COPE-LAND, of Peoria, for appellees.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is a suit to establish a constructive trust in real estate and personal property. Plaintiffs appeal from a decree dismissing the cause. A freehold is involved.

Christian Landau died testate in 1916. He gave a life estate in all of his property to his wife Anna. His will recited that his son Herman had received advancements equal to a ⅙ share, bequeathed $7500 to his son Emil which he regarded as an equal ⅙ share, and left the remainder to his children, Henry, Louise, John, and Mary. Upon John's death in 1935, Mary became the sole survivor of the four, and through successive bequests and devises became the owner of the entire remainder. This consisted of a 312-acre farm in Logan County, a dwelling in the city of Lincoln and certain bank accounts. On October 2, 1935, and March 25, 1936, respectively, the accounts were deposited to the credit of Mary and Wilbur E. Landau as joint tenants and on March 4, 1937, Mary similarly placed title to the real estate in their names as joint tenants. She died on January 3, 1950. Plaintiffs, Carl E. and Nettie Landau, are children of Herman, and defendants, Wilbur E. and Herbert Landau, are children of Emil, nephews, niece and only heirs-at-law of Mary Landau.

Plaintiffs' complaint alleges that a fiduciary relationship existed between Wilbur and Mary, that the joint tenancies were set up without Mary receiving any competent independent advice, that there was no consideration for the transfers and that a constructive trust should be declared in favor of Mary's heirs.

Mary Landau was a spinster and lived in the home of her parents. After their death, she continued to reside there with her brothers, Henry and John, who handled the busi-

ness affairs for the three of them as owners until Henry's death in 1928. Thereafter John looked after things for himself and Mary, equal owners, until his death at which time she was left alone. Emil, who resided in Chicago, was appointed executor of John's estate and assisted Mary in her business affairs until the death of Emil's wife and his own illness in October, 1935, which culminated in his death on March 20, 1936. Wilbur Landau, son of Emil, who also lived in Chicago, then assisted informally in John's estate until his appointment as administrator d/b/n with will annexed after Emil's death. He also began helping Mary with her business affairs, which were largely collecting cash and grain rentals from the leased farm land, paying taxes and insurance, and the like.

From the foregoing background, we proceed to the evidence by which plaintiffs seek to meet the burden imposed upon them of proving the existence of a fiduciary relationship by proof which must be so clear, convincing, strong, unequivocal, and unmistakable as to lead to but one conclusion. *Kloze* v. *Fordtran,* 412 Ill. 461; *Houdek* v. *Ehrenberger,* 397 Ill. 62.

Plaintiff Carl C. Landau testified to occasional visits with Mary and her brother John in their home and his. Three women were called by plaintiffs and their evidence established that Mary was on good terms with her nephews, including Carl, and that she spoke well of them. One of the women, who lived in the household for 2½ years prior and subsequent to John's death, heard Mary comment about the joint account with Wilbur and that he could also write checks. She also testified that Wilbur had been consulted about the witness's request for a raise and he was quoted by Mary as saying that she could not have it. This was the only testimony offered by plaintiffs dealing with the relations of Mary and Wilbur. Thus they rely almost exclusively upon the testimony of defendant's witnesses, particularly that of Wilbur Landau. His version is gathered

from his answers to the interrogatories, statements made when called as an adverse witness under section 60 of the Civil Practice Act, and his testimony at the trial.

After the death of John, Mary did not want to live alone. She made various proposals to Wilbur, the pith of which was that she wanted a member or members of his family to live with her and wanted him to help her with business affairs. She in turn agreed to place her real estate, which was the bulk of her property, in joint tenancy with him. She spoke of him quitting his job and moving to Lincoln but finally left it that he should try to continue working and if she ever wanted him to move down permanently he would quit and do so.

Wilbur moved his furniture and belongings to Lincoln in June, 1937, after his daughter Delores finished her school term. He and his wife thereafter spent their time between a hotel apartment in Chicago during the week and in Lincoln over weekends, some of which were extended to four days. Delores resided with Mary continuously for the next five years until she completed high school. Wilbur's wife also stayed there for various lengths of time from a week to a month. Wilbur's family took Mary on their vacations. In 1938 they went to the West Coast and Mexico and in 1939 to the World's Fair in New York. Other winter vacations were spent in Florida.

Wilbur testified as to his management of the farm after the deed was made. When anything came up he would take Mary to the farm, they would talk it over and if they agreed that it was alright they would go ahead. Typical of the problems were whether the proposed sale of gravel was at the right price and whether its removal from the creek would cause the land to wash; when to sell the rent grain; establishing values for insurance purposes and the like. Rentals and other income were deposited in the joint accounts and expenses were paid by check therefrom, usually by Wilbur. He withdrew none for his personal use.

As heretofore noted, plaintiffs rely heavily upon the testimony of the defendant, Wilbur Landau, although they say that it is largely his own conclusions and consists of self-serving statements. They are sharply critical because he could not relate exact conversations with Mary, seemingly ignoring the fact that such conversations took place more than 20 years prior to the trial. This case is largely grounded on the interpretation which they give to his evidence. Although they do not have to vouch for his veracity, they are bound by his testimony as an adverse witness which stood uncontradicted and unrebutted. *Kapraun* v. *Kapraun*, 12 Ill.2d 348.

The deeds transferring title in joint tenancy were prepared by a Chicago lawyer, who was one of the attorneys for John's estate. The lawyer's secretary, who prepared the deeds, was used as a "strawman" in the transaction. She testified that she had been in Mary's home several times and that Mary told her she wanted to put the property in joint tenancy. After the deeds were prepared, they were mailed by the lawyer to Mary who signed and acknowledged in Lincoln before a Logan County notary and had the deeds recorded. They were then mailed to the nephew in Chicago.

Plaintiffs contend that Mary received no independent advice prior to executing the deeds, and that the Chicago lawyer was not really of her own choosing. The lawyer had been attorney for Wilbur's father for many years and was retained by the father in the administration of John Landau's estate. He continued to represent the estate after Wilbur's appointment as administrator d/b/n. While Wilbur had known him many years there was no proof that he had ever acted as Wilbur's attorney. Regardless of how Mary procured his services she must have been satisfied with them. The lawyer was at her home several times, she called at his office in Chicago, and the transaction was thereafter completed by mail. Wilbur did not direct the prepara-

tion of the deeds, nor was he present when they were drafted. Mary's acknowledgement was taken by a notary in a lawyer's office in her home city of Lincoln, and she could have obtained additional advice if she chose to do so.

While this court has from time to time set out factors and circumstances to be considered in ascertaining whether a fiduciary relationship in fact exists, we have consistently refused to set their precise boundaries. The underlying equitable test of the existence of such a relationship in a constructive trust case is the repose of special confidence and trust on one side and domination and influence on the other. (*Mors. v. Peterson,* 261 Ill. 532; *Seely v. Rowe,* 370 Ill. 336; *Dyblie v. Dyblie,* 389 Ill. 326; *Moneta v. Hoinacki,* 394 Ill. 47; *Maley v. Burns,* 6 Ill.2d 11.) We apply that test here.

The evidence reveals that Mary was an intelligent, retiring spinster who preferred to rely on others for advice and help. She sought and received help over the years from her respective brothers, and, after the death of the last of them, from her nephew. It is apparent that Mary had affection for Wilbur, respect for his judgment, and that she reposed confidence and trust in him. On the other hand, there is no proof of domination by him or the imposing of his will over hers at or prior to the time of making the transfer, or of the exertion of influence upon her in making the decision. He lived quite a long distance from her without the means of daily contact often associated with the building up of a fiduciary relationship.

At the time Mary made the deed she was 66 years old and her physical and mental faculties were good. She understood what she was doing and its legal effect, as evidenced by a discussion of the possibility of Wilbur's death preceding hers because of his ill health. She indicated that in such event the property would go back to her, and his wife and child would get nothing. A letter from Mary to Wilbur dated about a month after the execution of the

deed is revealing. She wrote of having received a letter from Carl after someone had sent him word of what was going on, that he was angry, that it was the longest one he had ever written and that it was "such a one" and "it made me sick when I read it." The letter to which she referred took her to task for making the property transfer and Carl stated that he was much disappointed in her. Nothing in the record indicates that she was then, or ever, dissatisfied with the arrangements she had made. On the contrary, three letters written to Wilbur in November and December, 1949, just a few weeks prior to her death and about 12 years after she had set up the joint tenancies, were very friendly and expressed concern over his health.

We agree with the finding of the trial court that plaintiffs have wholly failed to meet the burden of proof that a fiduciary relationship existed. Since neither fraud nor undue influence were alleged or proved, there is no basis for the establishment of a constructive trust.

In view of our holding on the fiduciary relationship issue it is unnecessary to comment upon defendants' contention that the action is barred by *laches*.

We find no error in the decree of the circuit court of Logan County and it is, accordingly, affirmed.

*Decree affirmed.*