Joanna Gwin Clow **CLAYTON** and Joanna Gwin Clow Clayton, Jr. (formerly known as Joanna Gwin Clow), Plaintiffs-Appellants,

v.

**JAMES B. CLOW & SONS,** an Illinois corporation, Lawrence B. Pryor, as executor of the will of Hattie B. Clow Pryor, deceased, Earle F. Johnson et al., Defendants-Appellees.

No. 14247.

United States Court of Appeals
Seventh Circuit.

Jan. 28, 1964.

Theodore C. Diller, Newell S. Boardman, William H. Hillier, Charles H. Weiland, Chicago, Ill., Jerome S. Hafter, Charles S. Tindall, Jr., Greenville, Miss., Lord, Bissell & Brook, Chicago, Ill., Wynn, Hafter, Lake & Tindall, Greenville, Miss., of counsel, for plaintiffs-appellants.

Charles M. Price, James T. Otis, Chicago, Ill., Spray, Price, Townsend & Cushman, Chicago, Ill., of counsel, for defendants-appellees James B. Clow & Sons, Inc., and Earle F. Johnson.

James A. Velde, Lloyd W. Bowers, Ware Adams, Chicago, Ill., Gardner, Carton, Douglas & Chilgren, Chicago, Ill., of counsel, for individual defendants-appellees.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Joanna Gwin Clow Clayton and Joanna Gwin Clow Clayton, Jr. (formerly known as Joanna Gwin Clow), plaintiffs, citizens of the state of Florida, have appealed from a judgment of the district court which dismissed for want of equity, at plaintiffs' costs, a diversity action brought by them against James B. Clow & Sons, an Illinois corporation,[1] Lawrence B. Pryor as executor of the will of Hattie B. Clow Pryor, deceased, Earle F. Johnson, et al., defendants.

This case involves the validity of four separate sales of its stock (herein referred to as the Clow stock), made by Hattie B. (Clow) Pryor in 1935 and 1938 to the Company. Plaintiffs are the daughter-in-law and the grandchild of Mrs. Pryor and the defendants are the Company, Earle F. Johnson, a former officer and director thereof, and a large number of persons and banks who later acquired the stock which was sold to the Company.

The errors relied on by plaintiffs arise from the district court's conclusions of law and findings of fact, its opinion, 212 F.Supp. 482, and its final judgment.

Although the trial lasted more than a month, the evidence is largely documentary and the facts are mostly undisputed. Plaintiffs complain that the court's findings of fact are largely conclusions.

Plaintiffs seek restitution to a testamentary trust of common stock acquired from it in the name of the Company through alleged breaches of trust and fiduciary duty, participation in such breaches and upon tracing trust property to donee defendants.

---

1. While plaintiffs call our attention to the fact that defendants in briefs and appendices filed herein have referred to the corporate defendant as James B. Clow & Sons, Inc., a Delaware corporation, plaintiffs assert said defendant is actually James B. Clow & Sons, an Illinois corporation. Plaintiffs have asked us to make a correction accordingly.

The attorneys for the corporation and Earle F. Johnson, defendants, answer that the point raised is without significance to any issue on this appeal. They say that a 1955 merger of the Illinois corporation into a Delaware corporation was without regard to this action, and the merger would not in any way be affected by this action. Plaintiffs have not disputed this statement. We therefore consider it unnecessary to give further attention to plaintiffs' motion.

The corporation will sometimes be referred to in this opinion as the Company.

Among the facts supported by substantial evidence in the record or admitted by the pleadings are those which we now set forth.

In 1878, James B. Clow and his eldest son, William E., Sr. founded a jobbing business in plumbing fixtures which was incorporated in 1894. His other sons, Harry B. Clow, Sr., James C. Clow and Charles R. Clow, Sr. joined in the business before 1900.

William E. Clow, Sr. had two sons, William E., Jr. and Kent, and one daughter, Martha (still living), married to Donald B. Douglas. Harry B. Clow, Sr. married Elizabeth McNally. They had one son, Harry B., Jr., and two daughters, all living.

James C. Clow was married to Pearl Libby, who died in 1955. They had one child, James Beach Clow, who died in 1953.

William E. Clow, Sr. was president from 1908 to 1935, and chairman of the board until his death in 1942. William E. Clow, Jr., vice-president, became president in 1935.

Sidney C. Murray, attorney for the Company, died in 1954, before this suit was started.

The stock was held in the Clow family group. In 1894 when the Company was incorporated, a bylaw [2] was enacted providing that any common stockholder before selling his stock to a nonstockholder would be required to notify the Company of the proposed sale and offer the stock to other stockholders at the price contemplated. The same bylaw was in effect at all times relevant herein. The stock has not been listed on any exchange or traded in any over-the-counter market.

All of the men of the Clow family have either worked for the Company or been on its board of directors.

Charles R. Clow, Sr. married Hattie Barth. Charles R., Jr., was born to them in 1905. Charles R., Sr. died in 1910, leaving a will giving his Clow stock in trust for his widow Hattie, who was to receive the dividends during her life, and upon her death to their son Charles R., Jr., if then living. The will provided in article THIRD (c) that his widow, the trustee, should have the power to sell the whole or any part of the stock upon consent thereto given in writing by William E. Clow, Sr., Harry B. Clow, Sr. and James C. Clow, or, in the case of the death of any of them, then upon the like consent in writing of the survivor or survivors of them and the heirs, devisees, executors and administrators of the deceased, and under article THIRD (d) directed the widow-trustee *to reinvest* the proceeds of sale with the written consent of any two brothers. The will provided that the income from such reinvestments should go to the testator's widow during her lifetime and at her death the principal should go as provided with reference to the Clow stock.

Plaintiffs are the widow and daughter of Charles R. Clow, Jr. (who died March 1, 1943), only child of Charles R., Sr.

It is plaintiffs' position that Charles, Jr. owned two-thirds of the equitable reversion interest in Charles, Sr.'s trust under the Illinois law of descent; that this equitable reversion was a vested interest and, upon Charles, Jr.'s death, passed to the plaintiffs, his widow and daughter. Further they contend that under Charles, Jr.'s will, his interest in the trust shares sought to be recovered in this action, not being specifically bequeathed, passed under the residuary clause to plaintiff Joanna, Sr., except that his daughter Joanna, Jr. took a one-third interest as a child born after the will.

On January 1, 1932, Hattie Barth Clow married Lawrence B. Pryor, of Memphis, who is still living, and they moved to a plantation near Greenville, Mississippi, which Mrs. Pryor had inherited from Charles Pfeil, a deceased husband. Mrs. Pryor died in 1959 during the pendency of this suit.

2. Sec. IV, art. IV.

Charles, Jr., married Linda Lee Doan in 1930, and of that marriage there was born one child, Charles III, who is still living. Charles, Jr. deserted Linda and their infant son in 1931 and moved to California, where, in 1934, he secured an interlocutory divorce from Linda and married Ella Hall. In 1935, Linda had the interlocutory decree set aside, and Charles, Jr.'s marriage to Ella Hall was annulled. Charles, Jr. then moved to Mississippi to live with his mother and stepfather, Lawrence Pryor. In 1936, Linda secured a divorce from Charles, Jr. in Chicago and Mrs. Pryor and Charles, Jr. gave Linda and Charles III some Clow stock in settlement.

In 1937, Charles, Jr. married plaintiff Joanna Gwin and he was married to her at the time of his death in 1943. In 1942 to them there was born one child, Joanna Gwin Clow, plaintiff. Charles, Jr.,'s widow married Hugh Clayton in 1943.

Following the effects of the depression which came upon the United States, the Company in the spring of 1932 omitted its common stock dividend and Mrs. Pryor came to Chicago. Although she had been receiving dividends on the Clow stock and had inherited substantial amounts of property from Mr. Pfeil's estate, she was in financial difficulty. The effect of an agreement dated April 28, 1932, signed by Mrs. Pryor, Charles, Jr. and Linda, his wife, as supplemented by subsequent letters, provided that $150 a month was to be paid by the Company to Mrs. Pryor as well as to Linda, and charged against the personal account of William E. Clow, Sr. He was secured by Mrs. Pryor's Clow stock. These payments continued intermittently until December 1935.

William E. Clow, at this time, was a man in his seventies. He was then and had been for decades in control of the Company.

Mrs. Pryor's financial stringency continued during the period covering the four acquisitions of Clow stock involved here.

From April 1932 to January 1935, much correspondence took place between Mrs. Pryor and William Clow, Sr. indicating that she was seeking help, and there were letters from Linda to him asking for help for her and Charles III, followed by suggestions by Mr. Clow as to how Mrs. Pryor might exchange her Clow stock for a dividend-paying stock, reports on Charles, Jr.'s marital difficulties, and reports from William, Sr. to Mrs. Pryor about business conditions and when common stock dividends might be resumed.

In early December 1934, the Pryors came to Chicago and discussed with William, Sr. financial assistance for Linda. On December 20, 1934, William, Jr., vice-president, wrote Mrs. Pryor about a proposed merger of National Cast Iron Pipe Co. into the Company and the necessity of acquiring 1250 shares of common stock to retire a minority interest in National held by employees. It was first proposed that these shares be acquired by a pro rata contribution of stock from all stockholders, but Mr. Murray, the Company attorney, advised that Mrs. Pryor, as trustee, could not contribute stock and the proposal was changed to a pro rata purchase from all stockholders at $15 per share.

According to the testimony of defendant Earle F. Johnson, in December 1934, Mr. and Mrs. Pryor wanted to sell 2500 shares of Clow stock. On January 2, 1935, they came to Chicago to see William, Sr., and discussed with him means of saving Mrs. Pryor's Kansas City apartment house from foreclosure, Linda's financial situation, and the proposed National merger. They then went to Kansas City and the property was saved with funds advanced by William, Sr. Their trip to California to see Charles, Jr. followed and the Company lent $500 to them for the expenses incurred.

On January 15, 1935, Mr. and Mrs. Pryor returned to Chicago and met with William, Sr. and Johnson. A document was prepared for the sale by Mrs. Pryor of 1250 shares at $25 a share. There-

after, this document of sale was signed by Mrs. Pryor and consented to by Charles, Jr. and William E. Clow, Sr., Pearl Libby Clow and J. Beach Clow, the widow and only child of James C. Clow, and by Harry B. Clow, Jr., trustee, the son of Harry B. Clow. We shall refer to this sale as the first transaction. Upon the written request of Mrs. Pryor and Charles, Jr., the proceeds of this sale were used to purchase preferred stock of U. S. Pipe & Foundry Co., which was paying a dividend, and the stock was issued to Mrs. Pryor.

The following events preceded the second transaction. Although the Company had resumed payment of dividends on preferred stock, it obtained a bank loan sufficient to retire its remaining mortgage bonds. Mrs. Pryor needed more money. She wrote William, Sr. to sell a bracelet for her. She was bothered by collection lawyers. The mortgage on her Memphis home was about to be foreclosed and William, Sr. urged her to try to save it because "conditions are not going to continue very much longer". He was also trying to work out something to save her Kansas City property. The situation was not aided by the fact that, in April, 1935, Linda caused the vacation of a California interlocutory divorce decree against her which Charles, Jr. obtained October 3, 1934.

The record contains much correspondence between Mr. Pryor and William, Sr. seeking a solution of Mrs. Pryor's financial problems. William, Sr. reviewed the situation with attorney Murray, who became a distinguished member of the bar of this court in 1924. William, Sr. suggested that Mrs. Pryor consult her Memphis lawyer, who then corresponded with William, Sr.

In September, 1935, the Wynn firm, who now represent plaintiffs in this case, took steps to procure a copy of the will of Charles R. Clow, Sr.

Under date of November 18, 1935, Charles, Jr. and Hattie, his mother, entered into a contract which, inter alia, in consideration of the cancellation of his indebtedness of $60,000 to her, and other considerations, conveyed to Mrs. Pryor all interest in the Clow stock which he then owned, "comprising a total of * * 4,000 shares", as well as "1542 shares of United States Pipe and Foundry * * * preferred stock"; for which Mrs. Pryor agreed to pay him, in installments, $25,000 with interest. Although Charles, Jr. retained a vendor's lien, the contract provided that she was given the right to exchange or sell any of said stock.

A member of the Wynn firm came to Chicago and said that a Greenville, Mississippi bank was lending Mrs. Pryor money and would take her Clow stock as security. At the request of William Clow, Sr., Johnson telephoned Mr. Pryor. Mrs. Pryor decided not to borrow from the Greenville bank but to sell 500 shares and, on December 21, 1935, she wrote the Company, mentioned Pryor's talk with Johnson, and said that she was glad that Mr. Murray agreed that "this transfer of the stock to me is perfectly legal." On the same day, she and Charles, Jr. signed and sent Johnson a document reading:

> "This is to confirm our sale to James B. Clow and Sons, five hundred shares of Capital stock of J. B. Clow and Sons—at $30 per share."

On December 24, 1935, Charles, Jr. wrote the Company saying that he had sold all his interest in the Clow stock to his mother, "but at the request of my mother I hereby authorize, ratify and confirm that you carry out the offer of my mother."

No written consents of any members of the Clow family were secured with respect to this sale. Johnson testified that Mr. Murray had advised that the November, 1935 contract conveyed the entire legal title to the stock to Mrs. Pryor, making any consents unnecessary. There is no evidence that Mrs. Pryor tried to obtain any such consents or that she tried to consult with any members of the Clow family, except William, Sr., with respect to the sale of that stock, which was taken in as treasury stock. It was sold when the directors in July, 1936 decided to do so.

In April 1936, attorney Hafter of the Wynn firm and Mr. Pryor came to Chicago to settle the divorce suit Linda had brought against Charles, Jr. While there they presented a certificate for 500 shares of Clow stock and asked its cancellation and the issue of certificates, as follows:

To Linda L. Clow — 200 shares
To a trustee for
   Charles III — 200 shares
To Mrs. Pryor — 100 shares

The Company did so and the divorce decree was entered May 4, 1936. Mr. Murray and Mr. Johnson both approved the transfer.

In 1936 and 1937 Mrs. Pryor was borrowing money, although in 1937 she received dividends of $24,800 on her Clow stock. During 1936 and 1937 the Pryors used the Clow stock as collateral in borrowing in the South. In February 1937 she borrowed $34,450 from Southern Credit Corporation, but the Pryors were unable to pay down this loan. Attorney Wynn, as attorney for one of the creditors, pressed the Pryors for payment.

The **third** transaction, that of April 28, 1938, occurred under the following circumstances. April 8, 1938 Mrs. Pryor came to Chicago with Mr. Wynn and they saw William, Sr. and William, Jr. and proposed a loan of $20,000 against future dividends. The following day William, Sr. wrote he would take up to 800 shares at $50 per share, noting that he would shortly be 78 years old. On April 15, Mrs. Pryor wired him:

"Charles Larry and I had conference Decided would appreciate if you buy six hundred shares my stock Would put us out of debt Sending stock registered mail this afternoon Love Hattie"

Mr. Murray advised that he did not think that William, Sr. should buy the stock, but that the Company could do so, and the Company did make the purchase of 600 shares.

The written consent of Charles, Jr. was obtained by Mrs. Pryor and the Company obtained the written consents of William, Sr., Pearl Libby Clow, J. Beach Clow and Harry B. Clow, Jr.

All of the stock sold by Mrs. Pryor in the second and third sales was put in the Company treasury and, after a period of six months, was bought by William, Sr. There was no agreement between him and the Company at the time of the purchase from Mrs. Pryor that the shares acquired from her would be resold.

The **fourth** transaction of Clow stock by Mrs. Pryor to the Company involved 500 shares. The manner of the sale is but meagerly described in plaintiffs' brief. The circumstances are that on June 23, 1938 Mr. Pryor came to Chicago and offered to the Company at $50 a share, 500 shares of its stock belonging to Mrs. Pryor. The sale was made and the stock was resold by the Company in the fall and winter of 1938 to William, Sr., at $50 a share, it having been offered to other stockholders, none of whom was interested in buying it.

Plaintiffs cite a consent decree entered by the chancery court of Washington County, Mississippi, on December 14, *1953* in a case brought by Hattie B. Pryor against Lawrence B. Pryor, in which separate answers were filed by Joanna Gwin Clow Clayton, Joanna Gwin Clow, a minor, and Charles R. Clow III. We believe that this decree had no retroactive effect upon the Clow stock involved in this case.

According to their brief, plaintiffs rely upon their contention that William, Sr. was an express fiduciary under the will with duties equivalent to those of a co-trustee. They qualify their position by stating that, even if he was not an express trustee, William, Sr. was a trustee *de son tort*. Thus, in either case, they say he was prohibited from self-dealing. As to Mrs. Pryor's discretionary powers stated in the will, consisting of the powers to sell and reinvest, plaintiffs contend that they could be exercised only with the written consents of William, Sr. and his two brothers (or the successors of any deceased brother), except that, as

388

to reinvestment, the consents of only two brothers were required. They take the position that this made William, Sr. and the other consentors the equivalent of co-trustees exercising powers fiduciary in character.

Defendants deny that the consentors William E. Clow, Sr., Harry B. Clow, Sr. and James C. Clow or their survivors as provided in article THIRD (c) of the will of Charles R. Clow, Sr., and, if dead, their heirs, devisees, executors and administrators, were express fiduciaries with duties equivalent to those of trustees.

■ 1. The attempt of plaintiffs to make the consentors William E. Clow, Sr., Harry B. Clow, Sr. and James C. Clow or their survivors express fiduciaries under article THIRD (c) of the will of Charles R. Clow, Sr., must fail. The corporate bylaw was intended as a means of continuing the control of the family over a business which had been in existence for many years as a family venture before its incorporation. It is a practice which has been considered lawful for many years. People ex rel. Rudaitis v. Galskis, et al., 233 Ill.App. 414 (1924); Douglas v. Aurora Daily News, 160 Ill. App. 506 (1911). In Galskis, the court relied on 14 Corpus Juris 669, § 1040. In the corresponding section in 18 C.J.S. Corporations § 391, p. 924, it is stated that such a restriction is generally held valid.

■ It was obviously the purpose of Charles R. Clow, Sr., by article THIRD (c) of his will, to provide for a continuation of the family control of the business so far as possible. This interpretation of the will is in harmony with a finding of the district court that it is a reasonable inference that Charles R. Clow, Sr. did not by the consent clause of his will intend to defeat or violate the bylaw, but rather intended to comply with it, be-

cause of the fact that he and his lawyer, who prepared the will, had worked for the company and had knowledge of the bylaw and the desire of the brothers to keep the stock in the family. Certainly, it was not clearly erroneous for the district judge to so find. 28 U.S.C.A. rule 52(a). There is substantial basis in the evidence for the inference upon which the district court based its finding and it is not clearly erroneous. McDermott v. John Baumgarth Co., 7 Cir., 286 F.2d 864, 868 (1961); Snorgrass v. Sears, Roebuck & Co., 7 Cir., 275 F.2d 691, 693 (1960); Hill v. Gregory, 7 Cir., 241 F.2d 612, 614, cert. denied 354 U.S. 938, 77 S. Ct. 1400, 1 L.Ed.2d 1537 (1957). We conclude that the consentors, under article THIRD (c) of the will of Charles R. Clow, Sr., were not acting in any capacity except to maintain the corporate policy of family control. The testator did not indicate that they were expected to act as fiduciaries obligated to Mrs. Pryor.

2. The correctness of this result is not impaired by article THIRD (d) of the Charles R. Clow, Sr. will. We agree with the district court that clauses (c) and (d) of article THIRD are unrelated. By article THIRD (d), the testator provided protection for his widow, by stipulating that his three brothers or any two of them should be consulted by his widow, as trustee, for advice in connection with investments in such securities or loans which she might elect, the income from which was to be hers during her lifetime. The will makes no provision for the substitution of anyone in case of the death or failure of any of the three named brothers to act. We deem it merely a practical method of establishing an advisory service for the testator's widow. It did not create the named brothers trustees.

3. In their complaint which initiated this case, plaintiffs charged William, Sr. with actual fraud.[3]

3. For instance, they alleged that,
  "In conducting this campaign to persuade Mrs. Pryor as Trustee to sell such shares, William, Sr. acted in bad faith

and for selfish reasons, with the intent and purpose of taking advantage of the financial plight of Mrs. Pryor and the plight of Charles, Jr. as magnified by Wil-

The district court, 212 F.Supp., at 532, 535, analyzed plaintiffs' evidence as to actual fraud, stating, *inter alia,* that defendants had pointed out that Mr. Pryor, a college graduate and state legislator, had participated in these transactions with Mrs. Pryor, yet he knew nothing questionable about any of the sales, and, although a party to this litigation after Mrs. Pryor's death, did not appear. They also point out that Mr. Wynn, with a duty as executor of Charles, Jr.'s estate, which was kept open for thirteen years, even after this suit was begun, made no claim that the transactions were unfair.

The district court proceeded to find, 212 F.Supp. at 537, that there is not only no evidence establishing actual fraud on the part of William, Sr., but, to the contrary, the evidence proves that he committed no fraudulent acts in arranging for the Company's purchase of Mrs. Pryor's stock at her request and at prices others suggested, and that he made no affirmative misrepresentations and concealed nothing from her.

4. In this setting, plaintiffs in their brief in this court, practically concede that under Illinois law they have failed to establish their charges of actual fraud. They shift their position and now contend that "the confidential relationship" placed a burden upon defendants to affirmatively establish that William, Sr. dealt fairly with Mrs. Pryor as trustee. From this new position, they argue that there was not a full disclosure of all material facts by William, Sr., that Mrs. Pryor, as trustee, did not have any competent or independent advice, that the prices paid for the shares acquired were not fair and adequate, and that the affirmative conduct of William, Sr. and the Company confirms the presumption of fraud.

■ The burden was upon plaintiffs to prove the existence of a fiduciary relationship, as charged, by proof clear, convincing, strong, unequivocal and unmistakable so as to lead to but one conclusion. Landau v. Landau, 20 Ill.2d 381, 383, 170 N.E.2d 1 (1960).

■ The elements of a fiduciary relationship have been defined by many decisions of the Illinois courts.[4] The evidence in the case at bar has been considered by the district court and it has found that no fiduciary relationship existed.[5] That finding is supported by

---

liam, Sr. in order to obtain such shares for himself and his family or for the Corporation. * * *"

They also alleged that he purported to give advice to Mrs. Pryor, almost all of which was incorrect, unsound, distorted and highly prejudicial to the rights and interests of Mrs. Pryor, both individually and as trustee; all such advice was offered for the purpose and with the effect of dissembling the true rights and duties of the parties; it was also offered for the purpose and with the effect of taking advantage of the difficulties of Mrs. Pryor and her son to persuade her to sell said shares to William, Sr. or to the corporation.

It was further alleged that William, Sr. and the corporation deliberately withheld vital and essential information concerning the corporation from Mrs. Pryor, and on several occasions deliberately misrepresented to her pertinent facts affecting the value of such shares.

4. Stenwall v. Bergstrom, 405 Ill. 281, 90 N.E.2d 778 (1950).

5. Finding C:
   (1) There was no confidential relationship between Mrs. Pryor or Charles R. Clow, Jr. and William E. Clow, Sr. at the time of any of the transactions involved in this action. In fact, the evidence indicates the very contrary.
   (2) While the relationship between William, Sr. and Mrs. Pryor was one of great cordiality, long friendship and real interest in each other's affairs, and William, Sr. frequently gave copious advice, little of that advice was followed. He tried to give assistance in solving Mrs. Pryor's perplexing and complicated financial problems. He worried about his nephew's recurring marital problems, but he did not dominate Mrs. Pryor nor was she subservient to him. She did as she pleased. She had attorneys and consulted them when she felt the need therefor. She conferred with bankers. She talked over her problems with her husbands and with her son. She lived many miles away from William, Sr. and did not see him at all with the exception of brief, occasional visits to Chicago when she was

substantial evidence in the record and is not clearly erroneous.

From our own review of the entire record in this case, we are satisfied that the findings and conclusions of the district court are correct. Moreover, the compulsion of 28 U.S.C.A. rule 52(a) leads us to the same result, because the findings of fact of the district court, supported by substantial evidence, are not clearly erroneous. We might add that we are able to distinguish the findings of fact from the conclusions of law and do not share the professed confusion seen by plaintiffs' counsel in that respect.

We hold that plaintiffs have not proved a violation by William, Sr. of any fiduciary obligation to plaintiffs.

However, plaintiffs argue that the four acquisitions were in breach of trust in that the proceeds of each of them were improperly distributed to the widow-trustee personally who had no right to receive principal, and that William, Sr., Johnson and the Company were further liable because they knew of, participated in and encouraged these diversions of trust principal as a part of each acquisition.

Regardless of whether William, Sr. was a trustee or fiduciary, he had no control over the stock or Mrs. Pryor. While she owned the stock as trustee, she could sell and endorse the certificates, and she could reinvest the proceeds. If she used the proceeds for the benefit of herself and her son, William, Sr. was not responsible for that conduct. She used the amounts which she received in the first transaction to acquire shares in U. S. Pipe and Foundry Company, and after

November 18, 1935, when Charles, Jr. sold his interest in the shares to her, there was no trust.

■ The November 18, 1935 assignment, prepared by the Mississippi lawyers for Charles, Jr., and his mother, Mrs. Pryor, was relied on by the Company. In view of substantial evidence in the record, we are required to accept the findings of the district court upon which it based its conclusion that William E. Clow, Sr. did not, fraudulently or otherwise, induce Charles R. Clow, Jr. to transfer his interest in the Clow shares to his mother by the assignment of November 18, 1935, that the assignment was supported by a valid consideration, and that plaintiffs have no standing to sue because the assignment validly transferred to Mrs. Pryor all the interest that their predecessor, Charles R. Clow, Jr. had in the shares, whether derived from the will or from any intestate interest as alleged by plaintiffs.

We are likewise required to accept the findings that a rescission agreement between Charles R. Clow, Jr. and Mrs. Pryor under date of July 26, 1940, rescinded the assignment only with respect to the 2000 shares of Clow stock therein described, inasmuch as letters of Mr. Wynn, who prepared the rescission agreement as Charles, Jr.'s lawyer, revealed that there was no intention to have it affect the transactions by which Mrs. Pryor previously sold shares of Clow stock.

5. Several affirmative defenses have been presented by defendants, but in view of the result which we have just

accompanied by her husband or her lawyer.

(3) Mrs. Pryor was a capable adult, used to handling large sums of money and a plantation. She was well traveled. Her expenditures were tremendous. She was not a young, inexperienced widow with an infant child relying upon the predatory patriarch of the family of her first husband deceased decades theretofore. She fully understood the nature and effect of the documents she was executing. She suffered from no mental

or physical impediment. She entered the transactions voluntarily and never, up to the time of her death, raised any question about them.

(4) Neither Mrs. Pryor nor Charles, Jr. were strangers to legal counsel. They employed attorneys on many occasions. In April, 1936, she sent her lawyer Mr. Hafter from Greenville to Chicago with a certificate for 500 shares and referred in her letter to Mr. Hafter as "our attorney" and requested cooperation with him. * * *

reached, it will be unnecessary for us to consider them.

For these reasons, the judgment from which this appeal was taken is affirmed.

Judgment affirmed.