## Payton McGinnis

### v.

## Mary E. Jacobs.

*Filed at Springfield October 27, 1893.*

1. Chancery—*evidence by depositions—when no presumption in favor of findings of fact on appeal.*  Where a court hears a case, not on oral testimony, but on the depositions of the witnesses taken and reported by the master, the trial court will have no better facilities for judging of the weight and credibility of the evidence than this court, and an appeal may be regarded substantially as presenting a case for a hearing *de novo* upon the same evidence heard below.

2. Same—*allegations and proof must correspond.*  Where a resulting trust is set up by a complainant in her own favor, evidence tending to show a trust in favor of her deceased father, when he does not claim the property by descent, is inadmissible.

3. Evidence—*to establish an equitable title to land.*  The presumptions in favor of the party who has the legal title and the possession of lands are so strong, that to establish an equitable estate in another, especially when there is no written evidence of such estate, but proof of its existence is wholly by parol, requires evidence which is clear and satisfactory.  When the evidence is doubtful, or is capable of reasonable explanation upon theories other than that of the existence of an implied or a resulting trust, such trust will not be held to be sufficiently established to support a decree declaring and enforcing the trust.

4. Same—*declarations of a party after parting with property, in disparagement of his grant.*  The rule is well settled that the acts and declarations of the grantor or donor of land, made after he has parted with his title, can not be received to impeach the title of his grantee or donee.

5. Laches—*in asserting an equitable title.*  Where a person claiming an equitable estate in land, the legal title of which is in another who is in possession, receiving the rents and profits, fails for thirteen years to assert his claim or any right to any part of the rents and profits, the long delay will strongly militate against his claim.

Appeal from the Circuit Court of Sangamon county; the Hon. James A. Creighton, Judge, presiding.

Messrs. Conkling & Grout, for the appellant:

The complainant claims in her bill that under an agreement to hold for the benefit of both, Mrs. McGinnis took title to the

land. There is no evidence to sustain this allegation, but had there been any, it would not avail here. A resulting trust can not arise by agreement, and is not founded upon any contract. In this case, Mrs. Jacobs paid nothing. *Stephenson* v. *Thompson,* 13 Ill. 190; *Holmes* v. *Holmes,* 44 id. 168; *Sheldon* v. *Harding,* id. 73.

An express trust will not avail, as an express trust is void, and there is no resulting trust, and no trust by implication or operation of law. *Stevenson* v. *Crapnell,* 114 Ill. 19; *Biggins* v. *Biggins,* 133 id. 211.

Neither is it available on the theory that Mrs. McGinnis took it from Neal under an agreement to hold for Mrs. Jacobs. *Lantry* v. *Lantry,* 51 Ill. 462; *Lawson* v. *Lawson,* 117 id. 98.

There is no trust *ex maleficio,* there being no proof of any fraud or deceit. Bispham's Eq. sec. 218.

This case contains no proof of a single one of the elements of such a trust. The distinction between the cases is well set out in *Lantry* v. *Lantry,* 51 Ill. 465; *Biggins* v. *Biggins,* 133 id. 218; *Fischbeck* v. *Gross,* 112 id. 214; 2 Pomeroy's Eq. sec. 1056.

Even where, as between parties not related, a trust might arise by implication or construction, yet where a father conveys to or purchases land in the name of a child, the law presumes it to be an advancement. While this may be rebutted, the presumption exists and must be overcome. *Cartwright* v. *Hise,* 14 Ill. 417; *Taylor* v. *Taylor,* 4 Gilm. 303; *Maxwell* v. *Maxwell,* 109 Ill. 591; 1 Perry on Trusts, sec. 147; 2 Pomeroy's Eq. Jur. sec. 1039.

Trusts by implication, of the character sought to be established here, must arise in fraud. A broken promise, even, can not sustain them. *Perry* v. *McHenry,* 13 Ill. 227; *Stevenson* v. *Thompson,* id. 190; *Lantry* v. *Lantry,* 51 id. 464; *Adams* v. *Adams,* 79 id. 519.

The statements or conversations with Neal, made when Mrs. McGinnis was not present, are not competent in favor

of Neal or any one claiming under him. On the contrary, they can be used against him. This is fundamental. *Corder* v. *Corder*, 124 Ill. 233.

The statements of Mrs. Jacobs and Miss Dodds as to admissions and promises by Mrs. McGinnis and husband, made orally to Mrs. Jacobs after Neal's death, are not sufficient to base any trust on, and they are also flatly contradicted by Mrs. McGinnis and her husband. At most, it is an attempt to divert title to real estate by a disputed parol agreement, and such attempts are not favored by our courts. *Lantry* v. *Lantry*, 51 Ill. 458.

The evidence must be clear, and is always received with great caution. *Mahoney* v. *Mahoney*, 65 Ill. 406; *Wilson* v. *McDowell*, 78 id. 514; *Bragg* v. *Geddes*, 93 id. 39; *Harris* v. *McIntyre*, 118 id. 275; *Corder* v. *Corder*, 124 id. 229; *Biggins* v. *Biggins*, 133 id. 211.

Courts will not enforce a pretended trust after a great lapse of time, or *laches* on the part of the supposed beneficiary, especially where it appears that the supposed nominal purchaser has occupied and enjoyed the estate. *McDonald* v. *Stow*, 109 Ill. 40; *Oakley* v. *Hurlbut*, 100 id. 204; *Reynolds* v. *Sumner*, 126 id. 58; *Breit* v. *Yeaton*, 101 id. 242; Bispham's Eq. secs. 39, 203; 1 Pomeroy's Eq. secs. 418, 419.

Messrs. Patton & Hamilton, for the appellee:

When a trust arises from fraud, the Statute of Frauds does not apply. *Laing* v. *McKee*, 13 Mich. 134; *Ryan* v. *Dox*, 34 N. Y. 307; *Cox* v. *Cox*, 5 Rich. Eq. 365; *Teebles* v. *Reading*, 8 S. & M. 492; *Keith* v. *Purvis*, 4 Dees, 114; *Curdy* v. *Benton*, 79 Cal. 420; *Trapnall* v. *Brown*, 19 Ark. 49; *Schultz's Appeal*, 80 Pa. St. 405; *Kilpatrick* v. *Gliddon*, 81 Me. 137; *Wallgran* v. *Tebbs*, 2 Kay & J. 321.

As to trusts *ex maleficio*, see *Russell* v. *Jackson*, 10 Hon. 204; *Glass* v. *Hulbert*, 102 Mass. 40; *Williams* v. *Ireland*, 32 N. J. Eq. 135; *Hooker* v. *Axford*, 33 Mich. 453; *In re Fleetwood*,

L. R. 15 Ch. D. 531; *Riordan* v. *Banon,* 10 Ired. Eq. 469; *Fischbeck* v. *Gross,* 112 Ill. 208; *Gruhn* v. *Richardson,* 128 id. 178; *Wolford* v. *Herrington,* 74 Pa. St. 311; *White* v. *Cannon,* 125 Ill. 412; 2 Pomeroy's Eq. Jur. sec. 1053.

The Statute of Limitations, or *laches,* can not be interposed here. *Reynolds* v. *Sumner,* 126 Ill. 58.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Mary E. Jacobs against Caroline McGinnis, claiming that the complainant was the equitable owner of an undivided one-half of certain real estate in Sangamon county of which the defendant held the legal title, and seeking to compel the defendant to convey the same to the complainant in fee. The hearing in the court below, which was had on pleadings and proofs, resulted in a decree in accordance with the prayer of the bill. After its entry, the defendant died, and by order of the Circuit Court, Payton McGinnis, her husband and legatee, was permitted to intervene and perfect an appeal from the decree to this court, and upon his appeal, the record is now brought here for review.

The bill alleges, in substance, that on the fourth day of October, 1889, John A. Neal died, leaving him surviving the complainant and defendant, his only children and heirs at law; that in the year 1875, America Neal recovered a judgment against him, in the Circuit Court of Sangamon county, for $3136.33 and costs, and that at the time of the rendition of the judgment, John A. Neal was the owner in fee of certain lands in that county containing about 150 acres, and two town lots, one in the town of Chatham and the other in the town of Loami; that an execution upon the judgment was issued and levied upon this real estate; that before the execution sale, Neal concluded not to pay off the judgment, but to allow the property to go to sale, and have the same bid off for the benefit of his two daughters, the complainant and defendant, and

that to such arrangement both assented; that in order to carry out this arrangement and place the title of the property where it would enure to the benefit of both, the defendant represented to her father that she would attend the sale and buy in the property, either in her own name for herself and the complainant, or in the joint names of both, but that in whatever form the purchase should be made, it should be for the joint benefit of herself and the complainant; that Neal believed that she would carry out her representations, and permitted her to buy in the property in her own name at the sale, for the amount of the judgment and costs, Neal himself furnishing the money with which to pay the bid.

That afterwards a sheriff's deed was executed to the defendant, and she now claims that she never represented to her father that she would buy in the property for the benefit of herself and the complainant, but claims and gives out that she owns it in her own right, and that the complainant has no interest therein; that until a short time before her father's death, the complainant did not know that the sheriff's deed was made out to the defendant alone, but until that time supposed that it run to both the complainant and defendant as grantees.

That soon after the execution of the sheriff's deed the defendant took possession of the property, and has ever since received the rents and profits thereof; that although the legal title appears to be in the defendant, the fact is, that the equitable title to an undivided one-half of the property is in the complainant, and that the defendant holds the legal title thereto in trust for the complainant.

That December 7, 1889, the defendant executed a mortgage upon the 150 acres of land to secure the payment of $2400 to Edward T. Oliver, which money is still unpaid, and that such mortgage was executed in fraud of the complainant's rights and without her knowledge or consent, and constitutes no lien, as between the complainant and defendant.

The bill prays that the defendant be required to convey to the complainant one-half of the property purchased at the sheriff's sale, and account for and pay over to the complainant the rents and profits received therefrom, and that she be required to pay the mortgage debt out of her share of the property; but, in case it should appear that the sum represented by the mortgage was used to buy the property at the sheriff's sale, or that the defendant has become liable to pay or has paid any other sums of money used in such purchase, the complainant is willing that such moneys be made a charge upon the land, after deducting the rents and profits the defendant has received. The bill further prays for a partition of the property, or if that can not be made without manifest injury to the interests of the parties, that the property be sold and the proceeds divided.

The answer denies the equities of the bill, and, among other things, that the purchase of the property was made by the defendant under or in pursuance of any agreement or arrangement with her father that she should purchase for the benefit of herself and the complainant, or that she should attend and bid at the sale for the purpose of getting the title into the names of the complainant and defendant, or into the defendant's name for the benefit of herself and the complainant, or under any agreement on her father's part to furnish the money to pay the sheriff the amount of the bid. The answer admits the sale, and that the defendant bid off the property for the amount of the judgment and costs, but alleges that the property was bid in by her in her own name and for herself and no one else, and that she received a certificate of purchase, and subsequently the sheriff's deed, as she had a right to do. The answer denies that the complainant was ignorant of the way in which the purchase was made and the deed taken until after her father's death, but alleges that the complainant knew that the purchase was made by the defendant in her own name, with means furnished by her, and did not believe that

it was made under the alleged agreement. It denies that Neal furnished the purchase money, but avers that it was all furnished by the defendant, or by Payton McGinnis, her husband and agent. It admits that the defendant took possession of the property after receiving the sheriff's deed, and has ever since been in possession, receiving the rents and profits, the property being her own, and the complainant having no equitable interest therein; and it denies that the defendant holds the legal title to one-half of the property in trust for the complainant. It admits that on December 7, 1889, the defendant executed to Oliver the mortgage alleged in the bill, and that it is still unpaid, but avers that the mortgage debt represents a part of the original purchase money paid for the premises at the sheriff's sale, and denies that the mortgage was executed in fraud of the complainant's rights. The answer also sets up and pleads the Statute of Frauds.

Such being the issues presented by the pleadings, the principal question for our consideration is, whether the evidence adduced at the hearing justified the court below in finding the material allegations of the bill to be true, and finding that the equities of the case are with the complainant. In considering this question, it should be observed that all the evidence, with the exception of a small portion which is immaterial to this discussion, was taken before the master, and was reported by him without any conclusions on his part as to the facts thereby established. The chancellor who heard the case in the court below had therefore no better means of judging of the relative candor, fairness and credibility of the respective witnesses than we have, so that the appeal may be regarded substantially as presenting the case to us for a hearing *de novo* upon the same evidence heard in the court below.

The evidence in the record is quite voluminous, and to a considerable degree conflicting, but, after considering it with much care, we find ourselves unable to concur with the learned chancellor who heard the case below, but are of the opinion

that the evidence fails to sustain the bill, and that the decree should have been in favor of the defendant.

The rule is too well settled to require the citation of authorities, that the presumptions in favor of the party who has the legal title and the possession of lands are so strong, that to establish an equitable estate in the lands in another, especially where there is no written evidence of such estate, but proof of its existence is wholly by parol, requires evidence which is entirely clear and satisfactory. Where the evidence is doubtful, or is capable of reasonable explanation upon theories other than that of the existence of an implied or a resulting trust, such trust will not be held to be sufficiently established to entitle the beneficiary to a decree declaring and enforcing the trust.

The facts are undisputed that, in 1875, John A. Neal was the owner of the lands in question, and that they were then subject to the lien of a judgment for $3136.33 recovered against him in the Circuit Court of Sangamon county by America Neal, his divorced wife; that Neal paid off a portion of the judgment, and that the lands were afterwards sold on execution issued for the collection of the residue of the judgment, and the defendant bidding $2699.06, that being the amount remaining due on the judgment and costs, became the purchaser. The decision of the case must turn mainly upon the circumstances of that sale, and the terms of the arrangement under which the defendant bid in the property. The complainant's contention is, that Neal, instead of paying off the residue of the judgment, concluded to let the land go to sale, for the purpose of placing the title in his daughters, or of having it taken and held by the defendant for their joint benefit, he furnishing the money with which to pay the bid, and that the defendant bid off the lands and took and now holds the title under that arrangement.

By way of seeking to prove the alleged arrangement for bidding in the land, Mrs. Jacobs, the complainant, testifies

in her own behalf to a conversation which she had with her father, in the absence of the defendant, about one week before the sale. Her testimony as to that conversation is as follows: "I had a conversation with my father at my house just before the sale of the land. I could not say exactly when it was; it was before the sale. He was living at Chatham at that time. As far as I remember, he said he had concluded to let the land be sold and have it bid in in our name for my sister and me. He said that he had nearly money enough to pay for it, but he might have to borrow some. I don't know how much he said, I only know he said he had money, but would have to borrow more. I don't remember that he said who was to bid in the land, only he said he was going to have it sold and bid in for us—my sister and me. I believe this was about a week before the sale took place. I was not at the sale, and did not learn in whose name it was bid in until the July before father died." On cross-examination she says: "I do not know that any one else was present at this conversation. I only know from what he told me what arrangements were made as to the way in which the land was to be bid in."

James Jacobs, the complainant's husband, testifies to a conversation had by him with Neal, several weeks before the sale, which was also in the absence of the defendant. That conversation took place at Chatham, and was, as the witness thinks, some three, four or five weeks before the sale. He says that he went to Chatham and there met Neal, who talked to him about his business and said he was going to let his place be sold; that he had money and notes enough to pay off the judgment, but he had been advised not to do so, but to let the land be sold, so as to cut out his wife's thirds; that the witness asked him if it would have that effect, to which he answered that of course it would, and he wanted the witness and Payton McGinnis to come up the day of the sale and bid the land in for their wives; that he wanted them to have it, and wanted the witness and McGinnis to bid it off; that

after he got through, the witness said to him that it would·
take but one to bid it off, and if he wanted McGinnis to have
anything to do with it, to let him go and bid it off, if he would
do what was right with the witness' wife; that Neal said Mc-
Ginnis would do what was right; that witness did not want
to go to the sale and bid because he and McGinnis had no
dealings together, and were not on good terms, and if he,
Neal, wanted McGinnis to have anything to do with it, to let
him bid it off, if he would do what was right with the witness'
wife, and Neal said: "He will have to; it is mine and I want
it bid off for the two girls."

Witness Mary Darneille testifies that, on the day of the sale
and shortly before it took place, she met Neal in the hall of
the court house, and after shaking hands with him, asked him
what he was there for, to which he replied that he was going
to have his land sold there that day; that witness asked him
what he was selling his land for, and he said, to cut his wife
out of her third; that she asked him what he was going to
do then, to which he replied, that he was going to have it for
his two girls; that McGinnis was going to bid it in for his two
girls. It does not appear that this conversation took place
in the presence or hearing of the defendant or her husband,
or that it was communicated to them or either of them.

Payton McGinnis, on the other hand, testifies that about
two weeks before the sale, he and his wife had a conversation
with Neal at witness' house, in which Neal said that he had
made arrangements with Jacobs that he and witness should
pay off the farm debt, and he wanted witness to go ahead and
pay the other half of the debt and take the other half of the
farm property; that witness told him that he was willing to
do so if he, Neal, was, and Neal then went off and left him;
that he next saw Neal and had a conversation with him on the
Sunday next prior to the sale, which took place on Tuesday;
that this conversation took place at the witness' house, the
witness, his wife and Neal being present; that Neal then said

that Jacobs had gone back on him; that witness knew nothing about it until that day and said he thought certainly Jacobs would come up and pay his part and take half of the property; that Neal said that he would not do it; that he had come directly from there, and he said he would have nothing to do with it; that Neal seemed considerably worried because Jacobs had gone back on him, and witness thereupon told him that if Jacobs did not come up on Tuesday and help him, may be he, witness, could arrange it, and when he went to leave, witness told him that he and his wife would come up on Tuesday and see what they could do; that Neal then left for home and witness saw him next on the morning of the sale.

On cross-examination the witness repeats substantially the same statement, his testimony there being as follows: "Neal came to our house and told us that Jacobs and his wife were to pay a part of the debt, and wanted my wife and me to pay the other half and take the other half of the property. This was about three weeks before the sale, and I agreed to that arrangement. The next thing I heard of the matter was on Sunday before the land was sold on Tuesday. I live about seven miles from Chatham. He told me that Jacobs had gone back on him and would not do it. I never talked with Jacobs nor with his wife until after Neal's death. I told Neal I would meet him in town on Tuesday and see what I could do."

Mrs. McGinnis testifies in relation to the conversation on the Sunday prior to the sale, that she heard her father and husband talk about the land on that day; that the conversation was with both herself and husband; that her father said that she and her husband should come up on Tuesday, and he would bid the land in in her name, if they could raise the money; that Jacobs had gone back on him and would not help raise it; that he was angry when he came up, and said he would put the land in witness' name, and that they should not lose a dollar by it; that McGinnis told him he didn't feel able to shoulder so much, but would try to fix it in some way.

Both Mr. and Mrs. Jacobs deny that Neal was at their house on the Sunday or Saturday prior to the sale or that they saw him on those days, and Mr. Jacobs swears that Neal never asked him to furnish any part of the money necessary to bid in the property, but claimed to have sufficient means to pay the bid himself without help.   They admit that neither of them was present at the sale.

The testimony of Mr. and Mrs. McGinnis is quite strongly corroborated by that of other witnesses.  Thus Mary Shelton testifies that she had a conversation with Neal before the sale, in which he said that he had been over to Jacobs' and wanted him to go in with McGinnis and pay off the debt and divide the property between the two girls, and that Jacobs would not do it.   C. T. Dodds also testified that he met Neal terribly out of humor before the sale, and had a conversation with him in which he said that Jacobs and McGinnis had agreed to help him out in it, and Jacobs had concluded not to do it and had gone back on him.

John H. Miller testified that long before the sale Neal frequently told him that it was his calculation to divide the land between his two girls; that he supposed Jacobs and McGinnis would redeem the land and divide it between them; but on the Sunday before the sale Neal told the witness that he had been to Jacobs' and Jacobs refused to have anything to do with it, saying that he would not buy a law suit; that the land would go, unless McGinnis raised the money.

Elizabeth Miller, the wife of the witness last named, testifies that Neal came to her house on Saturday prior to the sale, and went over to Jacobs' that night; that he came back Sunday evening and said that Jacobs had agreed to help him out, but that he had gone back on him and would not do it; that Neal asked him if he was ready for the sale, and that Jacobs replied: "No, I don't want to buy a law suit;" that he, Neal, went right over to McGinnis' and told them that if they saved the property it was all right, but if not, it was gone, and that

McGinnis had promised to let him have the money to redeem the land if he could.

Major E. Barger testifies that, after the sale, he had a conversation with Jacobs, in which Jacobs said that Neal came to him before he went to McGinnis about the matter, and wanted him to take hold of it but he studied the thing over, and concluded that he would have nothing to do with it, as he didn't want to get into a law suit.

James Butler, who loaned to Neal $1500 of the money paid for the land at the sale, testifies that Neal applied for the money, and he, McGinnis and John Miller went on the note; that he said he was getting it for his daughter, as she was going to buy the place or had bought it; that he said he was borrowing the money for his daughter Mrs. McGinnis, and she was going to buy the farm.

Whether Neal had any resources of his own—and that is a question as to which the evidence is far from satisfactory—it is clearly proved that all the money used in bidding in and paying for the property, with the exception of about $200 which McGinnis claims to have advanced out of his own funds, was borrowed. McGinnis testifies that the first thing he did after coming to Springfield on Tuesday was to go to the State National Bank and arrange for a loan of the money he would need to use in case he bought in the property. On meeting Neal, however, he found that he had already borrowed $1500 from Butler, and had made arrangements at the Savings Bank for the residue of the money needed, and it was concluded that the arrangements for money made by Neal should be carried out. Those loans accordingly were effected, notes being given therefor signed by Neal, McGinnis and Miller. It seems that in giving the notes, Neal signed as principal and the other two as sureties. The means for paying the bid being thus arranged, McGinnis attended the sheriff's sale and bid in the land in the name of his wife, and paid therefor out of the moneys thus provided.

That Mrs. McGinnis, upon the execution to her of the sheriff's deed, which was some time in the year 1876, took possession of the land and retained possession thereof until after the death of Neal, which took place in 1889, receiving the rents and profits of the land, is alleged in the bill and is admitted by the answer, and of course is not open to controversy, and it is not claimed that during that whole period of about thirteen years, Mrs. Jacobs set up any claim to the land, or in any way sought to challenge or call in question Mrs. McGinnis' absolute, legal and equitable ownership thereof. It seems that Neal, after the sale, paid one or two installments of interest on the notes given for the money borrowed, and then finding himself unable to carry the indebtedness longer, he told McGinnis that he would have to take the indebtedness upon his own shoulders and do the best he could with it, as he, Neal, could not get his money together. McGinnis demurred, saying that it was a pretty heavy load to throw on him, to which Neal replied that he, McGinnis, should never lose a dollar by it; that he should go ahead and do the best he could with it, and pay off the debts and give him, Neal, a living, and that would settle it. After that McGinnis took the burden of the indebtedness upon himself, taking up the notes by which the same was secured and substituting therefor notes signed by himself and wife, and paying part, and finally securing the residue of it by executing the mortgage mentioned in the bill.

The record contains considerable evidence of the sayings and doings of Neal after the execution of the sheriff's deed to Mrs. McGinnis. Various declarations by him to the effect that he had no further interest in the land, but that it belonged to Mrs. McGinnis, were proved on behalf of the defendant, while the complainant gave evidence of various declarations and acts of his, mostly however in the absence of the defendant, tending to show that he still had or claimed some interest in the land.

Finally, the complainant testifies to an interview between herself and Mr. and Mrs. McGinnis, in the presence of Miss Ida Dodds, shortly after Neal's death, in which Mr. and Mrs. McGinnis both admitted that the lands in question were purchased under an arrangement by which one-half was to belong to the complainant, and expressed a willingness to settle the matter on that basis, and in this she is corroborated in the main by the testimony of Miss Dodds. This testimony, in all its material features, is positively denied by both Mr. and Mrs. McGinnis, they swearing that no admissions of that kind whatever were made by them.

After carefully considering all the evidence, we fail to find any clear and satisfactory evidence of a trust in favor of the complainant. It is probably true that it was Neal's original intention, after the judgment had been recovered against him by his divorced wife, to allow his property to go to sale, and to get his two sons-in-law to contribute equally towards raising the money necessary to bid the property in, and then to have it purchased at the execution sale and held in trust by the purchaser for the joint benefit of his two daughters. He very probably supposed that this scheme would be readily if not eagerly accepted by his sons-in-law, as the money to be raised was a little less than $2700, while the property, as the evidence shows, was worth at that time at least $7000. But the preponderence of the evidence, in our opinion, clearly shows, that Jacobs positively declined to enter into the proposed arrangement, or to aid in raising the funds necessary to bid the property in. The reason of his refusal seems to have been his personal hostility to McGinnis, and his apprehension that any enterprise in which they were jointly interested would inevitably result in litigation. Neal appears to have been greatly vexed at Jacobs' refusal to aid him in the matter, and in our opinion, the preponderance of the evidence shows that he thereupon abandoned his design of making Mrs. Jacobs the beneficiary of the trust he was about to create.

At any rate, whatever may have been Neal's previous plan, the evidence fails to show that at the time the property was bid in, he intended that it should be held in part in trust for Mrs. Jacobs, or that Mrs. McGinnis, or her husband and agent, in bidding in the property, assented to taking and holding the title upon any such trust. If Neal originally intended to make a gift of the property to his two daughters jointly, the circumstances attending the sale sufficiently indicate that, after Jacobs' refusal to join in the enterprise, his intention was that the property should go as a gift to Mrs. McGinnis alone.

Considerable reliance is placed by the complainant upon the acts and declarations of Neal after the sale, and after the title and possession of the land had passed to Mrs. McGinnis. It is doubtful whether the evidence of such acts and declarations is entitled to any weight whatever, as it relates in nearly every instance to matters which occurred in the absence of Mrs. McGinnis. The rule is too well settled to require discussion, that the acts and declarations of the grantor or donor of land, made after he has parted with his title, can not be received to impeach the title of his grantee or donee.

But waiving this objection, we are able to discover little if anything in either the declarations or conduct of Neal, after the execution of the sheriff's deed, which, if given the force of evidence, would have any tendency to establish an equitable title in Mrs. Jacobs. They consist mainly of acts and declarations indicating that Neal himself still claimed the land as his own, and not that he wished it to be regarded as belonging in whole or in part to Mrs. Jacobs. If the trust set up by the pleadings had been one of which Neal himself was the beneficiary, proof of this character might perhaps have had some force. But that is not the case which the complainant makes by her bill. So long as there is no trust in her favor, it is a matter of indifference to her, so far as this case is concerned, whether there was a resulting trust in favor of Neal or not. She is not here claiming the property or any interest in it by

descent, but is simply seeking to enforce a trust which she claims was created for her benefit at the time the land was bid in at the sheriff's sale. That claim is in no way aided by proof of a resulting trust, or of any other interest in the land vested in or claimed by Neal.

So far as the testimony in relation to the conversation between Mrs. Jacobs and Mr. and Mrs. McGinnis, in the presence of Miss Dodds, is concerned, all that need be said is, that we there have two witnesses on either side directly disputing each other. Under these circumstances, it is impossible to say that the complainant and her witness are to be believed in preference to the defendant and her husband. If these witnesses had given their testimony in open court, so that the chancellor could see them and hear them testify, if he had reached the conclusion that the complainant and her witness were more worthy of credence, we, upon well settled principles, would have felt compelled to defer to his opinion in the matter, as his opportunities of judging of the credibility of the witnesses would have been greatly superior to ours. But their testimony being taken before the master, no reason is apparent why we should prefer the witnesses on one side to those on the other, except so far as they are respectively corroborated by the other evidence in the case. But, on considering the whole evidence, we are of the opinion that the testimony corroborating Mr. and Mrs. McGinnis is quite as strong as that which supports the testimony of the opposing witnesses.

It is also worthy of remark, that it is difficult to reconcile the conduct of the complainant, in failing to set up any claim to the lands in question during the thirteen years which intervened between the execution of the sheriff's deed and her father's death, with the claim she now makes. Her bill sets up a present equitable ownership of the undivided one-half of the lands, such ownership dating from the delivery of the sheriff's deed. It was not an equitable estate in the remainder after her father's death, but one which, if the allegations

of her bill are true, entitled her to the present enjoyment of an undivided one-half of the land. She lived near the land, and must have been aware of the fact, which she now alleges in her bill, that immediately after the execution of the sheriff's deed, Mrs. McGinnis went into possession and has ever since been in possession and in receipt of the rents and profits. It is not pretended that at any time prior to her father's death, she set up any claim to the land, or any right to any portion of the profits arising therefrom. No explanation of her long delay in claiming or asserting her rights is stated in her bill, or can be made out from the proofs introduced by her. It is certainly remarkable, if she was in equity a half owner of this valuable property, she should see another in possession for so long a time, without claiming any interest in herself. Her long delay strongly militates against her present claim.

We are of the opinion therefore that the complainant's bill is not sustained by the proofs, and the decree of the Circuit Court will accordingly be reversed, and the cause will be re-manded to that court with directions to dismiss the bill, at the complainant's costs, for want of equity.

*Decree reversed.*