Morris S. BROMBERG and Holiday Lodge, Inc., an Illinois corporation, Plaintiffs,

v.

HOLIDAY INNS OF AMERICA, a Tennessee corporation, and HIOA, INC., a Tennessee corporation, Defendants.

No. 64 C 491.

United States District Court
N. D. Illinois, E. D.

Dec. 23, 1966.

Willard Lassers and Aaron Wolff, Chicago, Ill., for plaintiffs.

Patrick O'Brien, William Wineberg, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for defendants.

MEMORANDUM OPINION

MAROVITZ, District Judge.

This is an equitable action in which plaintiffs ask this Court to impose a constructive trust in their favor upon the motel property located at 4800 Marine Drive in Chicago, by virtue of an alleged breach of a fiduciary relationship. Jurisdiction is founded upon diversity of citizenship and the requisite jurisdictional amount.

In essence, plaintiffs contend that they and defendants entered into an alleged agreement to pursue a joint venture— that being to make plaintiff, Holiday

Lodge, Inc., of which plaintiff Bromberg was president at all times relevant hereto, a franchise member of the Holiday Inns' system. Allegedly, the agreement created a fiduciary relationship between the parties. Plaintiffs aver that defendants treated the agreement as terminated, and after the motel property was acquired in a foreclosure sale by the first mortgagee, First Federal Savings and Loan Association of Chicago, defendants purchased the property for themselves, in derogation of the alleged fiduciary relationship.

Defendants deny that any agreement was reached, that any fiduciary relationship was created, and that their purchase of the disputed property in any way infringed upon plaintiffs' legal rights.

Prior to November 15, 1958, Bromberg and his wife, who owned vacant real estate at 4800 Marine Drive, organized 4800 Marine Drive, Inc., an Illinois corporation, and conveyed this real estate to that corporation. First Federal made a first mortgage loan to 4800 Marine Drive, Inc., for $750,000, amortized over a fifteen year period, evidenced by a note and a mortgage covering said real estate, payable in monthly installments. The mortgagor also assigned to First Federal all leases and the rents, issues and profits.

Prior to the organization of 4800 Marine Drive, Inc., Bromberg organized the plaintiff, Holiday Lodge, Inc., which took a lease of the premises for 25 years, from May 1, 1959. The lease provided that it was subordinate to the lien of any mortgage upon the premises and all advances made on the security thereof.

A motel was constructed on the premises and operations commenced in December, 1959. Financial problems arose in meeting the mortgage payments. Holiday Lodge's business did not produce sufficient income to pay the rent, taxes and required mortgage payments, amounting in all to $10,300 a month. Partial payments were made on the mortgage, but were only sufficient to make the payments through June, 1960.

In October, 1960, the creditors of Holiday Lodge, formed a committee to try to work out the problems of the motel. But on January 30, 1961, an involuntary petition in bankruptcy was filed against Holiday Lodge and there was a general order of reference. In December, 1960, First Federal had accelerated the maturity of its mortgage note and declared the entire balance due.

On February 1, 1961, petitioning creditors filed a motion to adjudicate Holiday Lodge a bankrupt and to restrain First Federal from taking any legal action or commencing any proceeding to foreclose the trust deed executed by the "alleged bankrupt and secured on its realty" located at 4800 Marine Drive, until further order of the court. Such a restraining order was entered on February 3, 1961.

On the same day, Holiday Lodge filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, and was given authority to operate its business. On February 15, 1961, First Federal filed a petition to vacate the restraining order and for leave to join Holiday Lodge as a defendant in its proposed foreclosure.

Numerous hearings followed before a referee until April 12, 1961 when, no plan or arrangement having been filed by Holiday Lodge, the referee entered a rule a show cause why the proceedings should not be dismissed.

On April 14, 1961, Holiday Lodge's petition to make an arrangement was dismissed, an order of adjudication was entered, and a receiver appointed. On May 8, 1961, the referee vacated the restraining order of February 3. This was followed by the filing of a foreclosure suit on May 11, 1961, by First Federal in the Superior Court of Cook County, Illinois.

On its review of the order of May 8, 1961, the District Court, on July 18, 1961, commenced a *de novo* hearing on the petition to vacate the restraining order of February 3, 1961. On July 31, 1961, the court made its findings, entered an order reversing the referee's orders, except the one appointing a receiver, referred the case to another referee, and

specifically continued the restraining order against First Federal and denied its motion to vacate said order. An appeal followed.

On March 13, 1962, the Seventh Circuit reversed the order restraining First Federal from taking action to foreclose the mortgage. In the Matter of Holiday Lodge, Inc., 7 Cir., 300 F.2d 516, cert. denied Holiday Lodge, Inc. v. First Federal Savings and Loan Ass'n, 371 U.S. 824, 83 S.Ct. 43, 9 L.Ed.2d 63.

Thereafter, the foreclosure action was reactivated and the findings of the Master who heard the foreclosure matter were filed in November, 1962. A decree of foreclosure was entered April 10, 1963. This decree contained a finding that there was due to First Federal the sum of $949,426.30. At a Master's sale, First Federal was the sole bidder. Subsequently the sale was confirmed by the court. The association was put in possession on June 30, 1963. On May 12, 1964, the appeal from the foreclosure decree was dismissed. First Federal Savings & Loan Ass'n v. 4800 Marine Drive, Inc., et al., 49 Ill.App.2d 218, 198 N.E.2d 583.

In the period from February of 1961 to April of 1961, Holiday Lodge operated the motel as debtor in possession. The receiver operated the property from April of 1961 to January, 1962, when Holiday Lodge again operated the property as debtor in possession, a status it maintained until early 1963.

Plaintiff Bromberg became acquainted with Kemmons Wilson, Chairman of the Board of Holiday Inns prior to 1960, and in December, 1960, Wilson visited the Holiday Lodge. He was given a tour by Bromberg, and supplied with operating figures, a statement of the rates being charged for rooms, and a breakdown of the salary structure and information about expenses for utilities. Wilson appeared interested in the property, but the meeting did not reach the point of negotiations—it was merely a preliminary exchange of views.

In January, 1961, Wilson discussed the property with Jerome Morris of the creditors' committee, but on February 6, 1961, he wrote to Mr. Morris that Holiday Inns would prefer to buy vacant property and build a new inn in the Chicago area. Also during that month, Wilson spoke with First Federal about a possible sale of the property to Holiday Inns, but it was a short meeting and there was no price discussion. On February 7, 1961, Wilson wrote First Federal and stated that Holiday Inns was not interested in purchasing the mortgage, but Wilson requested that he be notified if there was a repossession and if First Federal decided that it wished to sell the property.

Bromberg testified that Wilson visited the Holiday Lodge again in August, 1961, and was given updated financial information, and in addition, a projected income report prepared by Howard Carlson of the accounting firm of Harris, Kerr, Forester & Co. Wilson does not recall this meeting. Bromberg implies that the data used to compile this report was confidential, and that Carlson was an agent of Holiday Inns. Although Carlson worked on the accounts of Holiday Inns for Harris, Kerr, there is nothing in the record to indicate that he was ever an officer, director or agent for Holiday Inns, or that he represented them in any of his dealings with Bromberg.

On March 14, 1962, Bromberg came to Memphis, Tennessee, to the main offices of Holiday Inns and was referred by Wilson to Jack Ladd, Senior Vice-President, franchise sales department. Ladd and Bromberg discussed Holiday Lodge's financial problems, and the efforts which Bromberg was making to straighten them out. He brought Ladd a four page document containing data on the current rent schedule of Holiday Lodge, a summary of operating expenses for 1961, an income and expense statement for 1961, and a month by month breakdown of the rentals received by Holiday Lodge for the years 1960 and 1961. Bromberg also testified that he brought Ladd the Carlson report and the public rate schedules of Holiday Lodge. They conferred further

with regard to Holiday Inns' franchise policies.

At this meeting Ladd gave to Bromberg a letter dated March 14, 1962, which plaintiffs claim amounts to a written agreement whereby Holiday Inns was to grant a franchise to Holiday Lodge, provided the conditions set forth therein were met. The letter provides, in part:

"We agree to accept an application from you for the purpose of joining the Holiday Inn system and we will place your application before our Executive Committee for final approval when we can ascertain that the following conditions have been met. We assure you that subject to the meeting of the following conditions, the approval will be forthcoming.

1.  (Rate Structure)

2.  (Restaurant)

3.  (Erection of Signs)

4.  ' * * * We would require that the holder of the first mortgage agree with you regarding a disposition of this mortgage before the Holiday Lodge could become a member of the Holiday Inns of America.'

5.  In the event a plan of arrangement can be effected without the approval of the mortgage company by the debtor, then the preceding paragraph regarding the attitude of the first mortgage lender will not apply."

This letter is of crucial importance to the decision in this case. Upon it rests plaintiffs' case. They rely upon it as a binding agreement which created a fiduciary relationship between the parties. Suffice it to say for now, defendants deny that the letter bound them in any way, and further assert that even if it did, plaintiffs have failed to comply with any of the conditions.

Following that meeting, Bromberg continued his attempts to solve the financial difficulties of Holiday Lodge, but was told by First Federal that the only thing which would stop First Federal's foreclosure action would be payment in full of all money due. Bromberg testified that thereafter Ladd said that if Bromberg was prepared to put up $50,000, Holiday Inns would guarantee to First Federal to pay interest and principal on a current basis, all operating expenses and taxes, and also within a reasonable time thereafter, to pick up the accrued interest. Ladd denies that this conversation took place and denies that Holiday Inns agreed to make any guarantees. Wilson testified that Holiday Inns has never entered into such guarantees, and Ladd testified that he did not have the authority to make such a guarantee.

In May, 1962, a meeting was held at First Federal, attended by officials of First Federal, Bromberg, Ladd and several others. Ladd was there admittedly at the request and invitation of Bromberg. The latter testified that Ladd attempted to present the alleged guarantee arrangement described above. Ladd testified that he only came to explain the Holiday Inns' franchise arrangement as an accommodation to Bromberg in order to assist Bromberg in gaining concessions from First Federal. Whatever the facts, however, it is undisputed that the meeting, after just a few minutes, was ended abruptly by Mr. Cavanaugh of First Federal who insisted on payment in full on the accelerated mortgage plus attorneys' fees. When it was apparent that payment would not be forthcoming at that time he terminated the meeting.

Subsequent to this meeting, Bromberg claims that Harvey Rawson told him that he could get financing for him and would supply equity up to $250,000, if Bromberg could bet a commitment from Holiday Inns to supply a franchise. Bromberg claims that he attempted to call Wilson and Ladd immediately, and several other times during the ensuing month, but that they either declined to take his calls, or did not return them. Ladd and Wilson testified that it was their practice to return long distance calls, but that they either do not remember receiving such calls or are sure that if they did they attempted to return them.

They were emphatic in denying that they attempted to avoid Bromberg's efforts to reach them. In any event, Bromberg admittedly did not write to either Wilson or Ladd to inform them of his alleged alternate financing offer. And it is undisputed that Rawson did not obtain a *commitment* "from any source and however informal, to pay to First Federal the moneys First Federal had demanded at the meeting through Mr. Cavanaugh." (Quotation of part of question asked of Bromberg at trial. As to whether he had obtained such a commitment he answered "No sir." Tr. 224–225.) Bromberg claims that Holiday Inns was bound by its March 14 agreement to grant a franchise on the strength of this "alternate financing," and its failure to do so constituted a breach of the fiduciary relationship.

While the foreclosure action was pending, Wilson continued to express his interest in purchasing the property. Although apparently not in Chicago for the specific purpose of discussing the property at any time during the pendency of that proceeding, Wilson did have several discussions regarding it with people from First Federal. However, First Federal received inquiries from various parties expressing an interest in the Holiday Lodge property, during and prior to the pendency of the foreclosure proceeding.

Following the foreclosure sale on May 10, 1963, First Federal sent an identical letter to eight individuals, including Holiday Inns, which had previously expressed an interest in the property. The letter stated that First Federal had acquired the property and that it was now in a position to discuss sale or other disposition of it. Wilson had a discussion with Mr. Harnstrom of First Federal on May 21, 1963, in which for the first time, there was a tentative discussion of price. Wilson testified that he had no knowledge of the letter sent out the preceding day, at the time of his conversation with Harnstrom.

Finally, on June 18 or June 19, 1963, First Federal met with Mr. Wilson and they agreed to retain Holiday Inns to manage the motel. At this time negotiations commenced for a possible lease of the motel by Holiday Inns. A lease arrangement was agreed upon and Holiday Inns took over the management of the property although a "Holiday Inn" sign was not erected because there was no written contract and final arrangements had not been worked out. On July 10, 1963, Holiday Inns forwarded a draft lease to First Federal.

During July, the Board of Directors of First Federal inspected the motel and discussed it at a Board of Directors' meeting. The Board determined that they desired to sell rather than to lease the motel. Following that meeting, two representatives of First Federal went to Memphis, terminated discussions concerning a lease, and negotiated a sale of the motel to Holiday Inns. The transaction was closed on September 23, 1963, for a sale price of $750,000.

As stated above, this case principally turns upon the construction to be given the March 14, 1962 letter. Indeed, plaintiffs so state at page three of their post-trial brief:

"As developed at the trial, the case rests squarely on the contract of March 14."

It is their argument that the letter was a contract for a joint venture, which created a fiduciary relationship between the parties, and which was breached when defendants acquired the motel property.

We are asked to declare a constructive trust in favor of the plaintiffs. The Supreme Court of Illinois defined a constructive trust, in two cases, as follows:

"Constructive trusts * * * arise by operation of law from circumstances which stamp the conduct of a person unfair or wrongful and permit him to take advantage of another. Fowley v. Braden, 4 Ill.2d 355, 122 N.E.2d 559; Restatement of Trusts, sec. 44." Carroll v. Caldwell, 12 Ill.2d 487, 493, 147 N.E.2d 69, 72 (1957).

"Constructive trusts are of two classes: one, where there is a fiduciary or

confidential relationship and the subsequent abuse of that confidence; and the other, where actual fraud is a basis for raising a constructive trust." Kapraun v. Kapraun, 12 Ill.2d 348, 350, 146 N.E.2d 7, 9 (1957).

The party seeking to establish the existence of a fiduciary relationship, including one emanating from a constructive trust based upon parol evidence, must prove the existence of that relationship "by proof clear, convincing, strong, unequivocal and unmistakable, so as to lead to but one conclusion." Clayton v. James B. Clow & Sons, 327 F.2d 382, 389 (7th Cir. 1964) (applying Illinois law). The cases are legion which support this view. See e. g. Reeve v. Strawn, 14 Ill. 94, 99–100 (1852); McGinnis v. Jacobs, 147 Ill. 24, 30–31, 35 N.E. 214 (1893); Winkelman v. Winkelman, 307 Ill. 249, 263, 138 N.E. 637 (1923); Mortell v. Beckman, 16 Ill.2d 209, 212, 157 N.E.2d 63 (1959); Perry v. Wyeth, 25 Ill.2d 250, 253, 184 N.E.2d 861 (1962).

But plaintiffs urge that these cases are inapplicable, because "what was lacking in those cases is precisely the element here present: a written agreement creating a joint venture and thus a fiduciary relation." (Page 2, plaintiff's post-trial reply brief.) They correctly assert that once the fiduciary relationship is established, the burden shifts to the fiduciary to show his good faith dealing by clear and convincing proof.

This Court has not been persuaded that the March 14 letter created a contract for a joint venture between the parties. The language of the letter plainly discloses that Holiday Inns agreed *only* to accept a franchise application from Holiday Lodge:

"We agree to accept an application from you for the purpose of joining the Holiday Inn system, and we will place your application before our Executive Committee for final approval when we can ascertain that the following conditions have been met. We assure you that subject to the meeting

of the following conditions, the approval will be forthcoming."

We believe, that those words amount only to an offer by Holiday Inns to approve a franchise application upon the meeting of the five specified conditions. Holiday Lodge was not bound thereby. They could have accepted the offer by complying with the requirements.

However, in the first place, no such application was ever filed by Holiday Lodge. Secondly, we are of the opinion that at least conditions 4 and 5 have not been met. Defendants allege that conditions 1, 2 and 3 have not been met, and plaintiffs do not argue to the contrary in their briefs.

It is undisputed that First Federal not only did not agree with Holiday Lodge regarding a disposition of the mortgage, but foreclosed on it as well. Thus condition 4 was not met.

Condition 5 required:

"In the event a plan of arrangement can be effected without the approval of the mortgage company by the debtor, then the preceding paragraph regarding the attitude of the first mortgage lender will not apply."

Defendants argue that "a plan of arrangement" should be construed in its strict sense as part of the Chapter XI proceeding, in which Holiday Lodge was involved at the time the letter was drafted. Since no such plan was ever effected, they urge that the fifth condition has not been met. Alternatively, they assert that even if "plan or arrangement" is not so limited in definition, plaintiffs failed to secure a firm alternate financing commitment.

Regardless of the interpretation which we place on the term, plaintiffs who must satisfy this Court by clear and convincing evidence so as to lead to no other conclusion but that the condition was met, have utterly failed to do so. Their reliance upon the purported alternate financing scheme obtained by Harvey Rawson does not meet the burden they must carry. For Rawson himself testified that he had obtained no firm

commitments. Even the alleged tentative negotiations in which he, Rawson, was involved, were premised upon the grant of a Holiday Inns' franchise. We cannot construe the fifth condition as requiring Holiday Inns to help the Holiday Lodge secure alternate means of salvaging its financial situation. The letter quite clearly requires that a solution be found *before* an application could be approved. There would be no warrant for imposing a constructive trust upon the basis of a record so lacking in substance.

By relying in their post-trial briefs upon the March 14 letter, plaintiffs evidently realized the futility of trying to prove their case with the other evidence which they adduced. It is far short of the "clear and convincing" foundation they must build. In our thinking, neither Wilson nor Ladd entered into a fiduciary relationship with plaintiffs. Even the alleged "confidential" information given to the defendants has not been proven to be so by clear and convincing evidence.

On the basis of the record before us, we are constrained to hold for defendants.

This memorandum may be treated as embodying the Court's findings of fact and conclusions of law, and an order of judgment for the defendants, with costs, shall be submitted.