Morris S. **BROMBERG** and Holiday Lodge, Inc., Plaintiffs-Appellants,

v.

**HOLIDAY INNS OF AMERICA** and **HIOA, Inc.**, Defendants-Appellees.

No. 16121.

United States Court of Appeals
Seventh Circuit.

Nov. 28, 1967.

Willard J. Lassers, Morris S. Bromberg, Alex Elson, Chicago, Ill., Aaron S. Wolff, Elson, Lassers & Wolff, Chicago, Ill., for plaintiffs-appellants.

Patrick W. O'Brien, William A. Wineberg, Jr., Chicago, Ill., for appellees. Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, MAJOR, Senior Circuit Judge, and KNOCH, Circuit Judge.

MAJOR, Senior Circuit Judge.

This equitable action was instituted March 17, 1964, by Holiday Lodge, Inc., a bankrupt, and its President, Morris S. Bromberg, seeking a declaration that a motel located at 4800 Marine Drive, Chicago, Illinois, was subject to a constructive trust on the theory that it had been purchased by defendants in violation of a fiduciary relationship existing between plaintiffs and defendants.[1]

The District Court, 278 F.Supp. 417 rendered a memorandum opinion which embodied its findings of fact, and concluded, "There would be no warrant for imposing a constructive trust upon the basis of a record so lacking in substance." From a judgment dismissing the complaint, plaintiffs appeal.

The contested issue here is whether the finding of the District Court that no fiduciary relationship existed between the parties was clearly erroneous.

In view of the theory upon which plaintiffs pleaded and tried their case, there is no occasion to engage in a detailed statement of facts, which plaintiffs concede are substantially as found by the District Court. The case is bottomed upon the premise that a fiduciary relationship arose from a March 14, 1962 letter written by Holiday Inns and directed to Bromberg as President of Holiday Lodge.

1. Subsequent to the filing of the action HIOA, Inc. was merged into Holiday Inns of America, and the defendants will herein be referred to as Holiday Inns.

As to this letter, the District Court stated:

> "As stated above this case principally turns upon the construction to be given the March 14, 1962 letter. Indeed, plaintiffs so state at page three of their post-trial brief:
>
> > " 'As developed at the trial, the case rests squarely on the contract of March 14.'
>
> "It is their argument that the letter was a contract for a joint venture, which created a fiduciary relationship between the parties, and which was breached when defendants acquired the motel property."

Plaintiffs reiterate their contention here. On brief they state, "The March 14, 1962 contract is basic to plaintiffs' case," and "The March 14 agreement established a fiduciary relationship between the parties. * * * They sue for breach of the fiduciary obligation created by the contract."

Plaintiffs, apparently realizing the weakness of their appraisement of the March 14 letter, place much stress upon certain incidents which took place prior and subsequent thereto as showing the intent of the parties. Such reliance is misplaced. There is evidence that Wilson, Chairman of the Board of Holiday Inns, one of the largest motel chains in the country, evidenced some interest in the purchase of Holiday Lodge. On the other hand, the evidence clearly demonstrates that Holiday Lodge, which was engulfed in bankruptcy, and Jerome Morris, the Chairman of the Creditors' Committee, were strenuously engaged in an attempt to induce Holiday Inns to come to their rescue.

As a prelude to a consideration of the March 14 letter, it is important to relate Bromberg's connection with Holiday Lodge and its financial situation at that time. Bromberg, an attorney and a former general counsel of the American Motor Hotel Association, was President of the lessee-bankrupt-debtor in possession of Holiday Lodge, Inc. The fee to the motel property was held by Central National Bank as trustee for a group of investors. Title was subject to a mortgage held by the First Federal Savings and Loan Association of Chicago (First Federal), which for over a year had been prosecuting in the State Court a foreclosure action to satisfy a defaulted mortgage indebtedness arising out of a $750,000 loan on the property.

In March 1962, Holiday Lodge was operating the motel as the debtor in possession during the pendency of a proceeding under Chapter XI of the Bankruptcy Act. At that time the total indebtedness of Holiday Lodge, with the motel as its only asset, was approximately $1,400,000. Prior to filing of a petition in bankruptcy by the general creditors of Holiday Lodge, it was operating the motel as the lessee. All the shares of stock in Holiday Lodge previously owned by Bromberg, his wife and his brother had long prior to March 14, 1962 been endorsed in blank and delivered to Morris as collateral for an outstanding loan in the amount of $100,000.

On February 3, 1961, the Bankruptcy Court in the Chapter XI proceeding entered an order restraining First Federal from pursuing its mortgage foreclosure suit, which order was continued by a further order entered July 31, 1961. From this latter order First Federal appealed. In re Holiday Lodge, Inc., Debtor, 7 Cir., 300 F.2d 516, decided March 13, 1962. In reversing such order, this Court held (page 520):

> " * * * the effect of the court's restraining order was to prevent the Association from resorting to the right of foreclosure to which it was entitled under the law of Illinois."

We now turn to the March 14 letter and the circumstances under which it was written. About the first of March 1962, Bromberg met Wilson at a meeting of the Hotel Association and told him that he would like to discuss the Holiday Lodge matter "to see if some program could be worked out." On March 13, Bromberg telephoned Wilson, who invited him to come to Memphis. This Bromberg did on the following day and, upon his arrival, Wilson referred him to Jack Ladd,

Senior Vice President in charge of marketing and sales for Holiday Inns. Bromberg and Ladd engaged in a lengthy meeting which was concerned generally with the financial situation of Holiday Lodge. Bromberg in particular was seeking a means to avoid foreclosure by First Federal, and Ladd suggested that a Holiday Inn franchise might solve Bromberg's problems. At that time, according to plaintiffs' brief, the parties were under the belief that the restraining order against First Federal was still in effect; they had not learned of this Court's decision rendered on the previous day, reversing such order.

Ladd prepared and delivered to Bromberg as President of Holiday Lodge a letter embodying the result of the discussion. As previously noted, plaintiffs concede that this letter is basic to their theory that a fiduciary relationship was established between plaintiffs and defendants. The letter was signed by Ladd on behalf of Holiday Inns, and the relevant portions are set forth in plaintiffs' brief as follows:

"This letter is for the purpose of reviewing an *agreement* reached verbally * * *

"We agree to accept an application from you for the purpose of joining the Holiday Inn system and we will place your application before our Executive Committee for final approval when we can ascertain that the following conditions have been met. We *assure* you that subject to the meeting of the following conditions, the *approval will be forthcoming.*

"1.   (Rate Structure)

"2.   (Restaurant)

"3.   (Signs)

"4.   * * * We would require that the holder of the first mortgage agree with you regarding a disposition of this mortgage before the Holiday Lodge could become a member of the Holiday Inns of America.

"5.   In the event a plan of arrangement can be affected *without the approval of the mortgage company* by the debtor, *then the preceding paragraph regarding the attitude of the first mortgage lender will not apply.*" (Emphasis supplied by plaintiffs.)

Referring to this letter, Bromberg testified that "all of this" was predicated upon his being able to straighten out his financial affairs. Ladd, referring to the proposed franchise, testified:

"* * * and he [Bromberg] thought that if Holiday Inns of America would grant him a franchise, that he would be in a stronger position to raise additional equity and also to get a substantial mortgage."

We agree with the District Court that this letter did not "create a contract for a joint venture between the parties," and we might add, a contract for any other purpose. There was no consideration for the letter, it was not signed by plaintiffs and it imposed no obligation upon them. By certain and unambiguous language it was only a proposal on the part of Holiday Inns that it would accept plaintiffs' application for a franchise upon their compliance with the conditions specifically set forth. Plaintiffs made no application for a franchise, evidently in recognition of the futility of so doing because of their inability to meet the specified conditions.[2]

The fallacy of plaintiffs' position is exposed by a statement from their brief:

"Hence, the agreement imposed firm conditions on plaintiffs and created fiduciary obligations upon defendants. If plaintiffs could make their peace with First Federal, as contemplated by paragraph 4, then a franchise was to be issued. In the alternative, if a plan could be effected without the approval of First Federal, a franchise was likewise to be issued."

As we have noted, the letter did not require plaintiffs to do anything; it

[2]. We need not discuss conditions 1, 2 and 3, inasmuch as conditions 4 and 5 are mainly in controversy.

merely afforded them an opportunity to make application for a franchise if the conditions set forth were met. Making "their peace with First Federal, as contemplated by paragraph 4" could be achieved only by satisfying the mortgage indebtedness in full, and no plan of arrangement "could be effected without the approval of First Federal." [3]

Thus, both avenues by which plaintiffs were entitled to make application for a franchise were definitely closed by the refusal of First Federal to agree to any plan of arrangement under Chapter XI, and its consistent demand that the mortgage indebtedness be satisfied in full.

Plaintiffs devote considerable effort designed to show Bromberg's good faith in attempting to obtain refinancing funds. We see no point in discussing this phase of plaintiffs' case because Bromberg received no definite commitment from any source and, as he admitted on cross-examination, he never "obtained a commitment from any source and however informal, to pay the First Federal the monies" owing on the mortgage debt.

At the request of Bromberg, Ladd attended a meeting at First Federal in May 1962, at which Bromberg introduced Ladd, who commenced talking but shortly was interrupted by a Mr. Cavanaugh, the senior officer of First Federal. There is some dispute as to just what was said at this meeting, but Bromberg's version is as follows:

> "Cavanaugh: Look, how much money have you got with you?
>
> "Ladd: About $40.
>
> "Cavanaugh: No, have you got enough money with you to pay all of the accrued interest and principal and attorneys' fees?
>
> "Bromberg: What attorneys' fees are you talking about?
>
> "Cavanaugh: Well, about $75,000.
>
> "Ladd: No, not at all.
>
> "Cavanaugh: Well, there is nothing more to talk about and let's call this meeting to a halt."

Referring to this meeting, Bromberg admitted at the trial, "Ladd did what he was able to, not what he was expected to do." It is evident that Ladd attended this meeting with the hope that he could be of assistance to Bromberg in persuading First Federal to refrain from foreclosing its mortgage. It is equally evident that any effort in this respect failed. Plaintiffs on brief, referring thereto, state, "Whatever they were, Cavanaugh, of First Federal, rudely rejected them."

Plaintiffs do not contend that Holiday Inns violated the alleged fiduciary obligation which it owed to them prior to the May 1962 meeting at First Federal; in fact, during that time Holiday Inns cooperated in an effort to aid Holiday Lodge in resolving its financial situation. On brief plaintiffs argue:

> "Immediately after the May meeting at First Federal, defendants refused to have any further dealings with Bromberg and without notice to Bromberg treated the contract as if at an end. This, despite the fact that plaintiffs had a contractual right to find, and in fact, succeeded in finding tentative alternate financing through Harvey Rawson based on a franchise and Bromberg was making vigorous efforts to contact defendants so that they might proceed with the deal."

This argument rests on the false premise that the March 14, 1962 letter constituted a contract when, as shown, it was nothing more than an offer by Holiday Inns to accept Holiday Lodge's application for a franchise when the conditions specifically set forth were met.

■ Following the May 1962 meeting at First Federal, there was no communication, oral or written, between Bromberg and either Wilson or Ladd. Plaintiffs make much of the fact that Holiday Inns gave no notice of its withdrawal of the offer contained in its March 14 letter. In our view, Holiday Inns was without legal obligation in that respect because after that meeting it was known to a certainty by all parties that First

---

**3.** Plaintiffs concede in their reply brief that a "plan of arrangement" under Chapter XI cannot be effected without the approval of the mortgagee.

Federal would proceed with its mortgage foreclosure, thereby rendering it impossible for Bromberg to meet the conditions set forth in the March 14 letter.

■ We find no occasion to discuss in detail the testimony concerning the alleged financing offer made by Rawson. Relative thereto, plaintiffs on brief state:

> "After visiting Cavanaugh, at First Federal, he determined that he could not recast the original mortgage, but was willing to obtain refinancing, if and only if Bromberg obtained a Holiday Inns franchise."

The refinancing referred to was grossly insufficient in amount and was predicated, upon the condition that Bromberg first obtain a franchise. Plaintiffs expose their incredible position on the Rawson matter by stating on brief, "To say that Bromberg had first to obtain the financing—without the franchise—is to thrust an impossible roadblock into the deal at its inception." This argument ignores the fact that Bromberg's right to make an application for a franchise was dependent upon his securing adequate financing, as specified in the proposal made by Holiday Inns. Now, plaintiffs would have us hold that Holiday Inns was under an obligation to grant a franchise to Holiday Lodge so that it might obtain refinancing. Obviously, Holiday Inns never assumed any such obligation.

■ Plaintiffs on brief continue, "What lender would issue a commitment or even waste five minutes considering a loan unless fully informed about and assured of a franchise?" We are inclined to agree that no lender would be so stupid; however, the argument comes close to an admission by plaintiffs that the conditions set forth in the March 14 letter could not be met. The impossibility of so doing must have been recognized by all parties not later than the May meeting at First Federal, when the latter adamantly adhered to its position that its mortgage foreclosure suit would proceed to a sale.

First Federal obtained a decree of foreclosure on April 10, 1963, in which it ,was found there was due it the amount of $949,426.30. (An appeal by Bromberg from this decree was dismissed by an Illinois Appellate Court. First Federal Savings & Loan Ass'n v. 4800 Marine Drive, Inc. et al., 49 Ill.App.2d 218, 198 N.E.2d 583.)

While of doubtful relevancy, we note that in the meantime Wilson showed some casual interest in acquiring Holiday Lodge. For instance, on May 21, 1962, in response to a letter from Morris, the Chairman of the Creditors' Committee, Wilson stated that he would appreciate being informed if Holiday Lodge ever came up for auction following the foreclosure, as Holiday Inns "might want to bid on it if it sells cheap enough." In April, and again in May, 1963, Wilson called at First Federal to inquire as to the status of the foreclosure proceeding. However, these conversations were had incidental to other business which Wilson had in Chicago; he never came to Chicago for the purpose of discussing Holiday Lodge.

At the Master's sale on May 10, 1963, First Federal was the sole bidder and obtained title to the property with a bid of $825,000. Bromberg was among those present at the sale.

Prior to May 10, 1963, First Federal received inquiries from various prospective purchasers, and their names were kept in a file. On May 20, 1963, it sent identical letters to eight parties, including Holiday Inns, which read:

> "This is to advise that First Federal purchased the above property in a recent foreclosure sale. We now feel we are in a position to discuss sale or other disposition of this property.

> "If you still have an interest as previously indicated, would you be kind enough to contact the undersigned, or Mr. Fred Harnstrom, at your convenience at an early date."

Prior to the time it obtained physical possession of the motel, First Federal tried, without success, to find a manager.

In June 1963, First Federal contacted Wilson, and a temporary arrangement was made for Holiday Inns to manage the property. In a subsequent discussion, the parties agreed upon a lease, with an option on the part of Holiday Inns to purchase. On July 10, 1963, Holiday Inns proposed a form of lease to First Federal. After reviewing the situation, the latter's directors decided against leasing the property and instructed its officers to attempt to sell it. First Federal's officers then went to the Memphis headquarters of Holiday Inns on July 23, 1963, and negotiated a sale to Holiday Inns for $750,000. The transaction was closed on September 23, 1963. Having acquired title to and ownership of the property, First Federal had the legal right to dispose of it and, in our view, Holiday Inns had an equal right to purchase it. In this connection, it is pertinent to observe that there is not even a hint of collusion between First Federal and Holiday Inns.

Plaintiffs in their reply brief, referring to the May 1962 meeting at First Federal, state, "Holiday Inns had fiduciary obligations before the meeting and it continued to have such obligations after the meeting," and "The mere purchase of Holiday Lodge by Holiday Inns under the facts at bar was a wrong to plaintiffs." Even though we assume, contrary to what we hold, that Holiday Inns was under a fiduciary obligation to plaintiffs by reason of the unaccepted proposal contained in its March 14, 1962 letter, such obligation was extinguished when it became known by all parties that First Federal would proceed with its mortgage foreclosure. By that time, any ray of hope which Bromberg might have entertained was gone. After long litigation, First Federal had vindicated its right to foreclose the mortgage. The property was sold at public sale, and First Federal made the only bid.

As previously shown, plaintiffs' case is bottomed entirely on the premise that the March 14, 1962 letter from Ladd to Bromberg was a contract for a joint venture, from which flowed the fiduciary obligation complained of. In support of the premise, plaintiffs cite a single case. Carroll v. Caldwell, 12 Ill.2d 487, 147 N.E.2d 69. In that case the parties entered into an agreement which involved the sharing of royalties arising from an oil and gas lease on certain property. This Court, in Pinkowski v. Coglay, 7 Cir., 347 F.2d 411, discussed the Illinois law as announced in *Carroll*, and concluded (page 413):

> "Indispensable elements of a joint venture in Illinois appear to be an association of two or more persons to carry out a single enterprise with a legitimate purpose, a community of interest in such purpose, expectation of profits and the sharing thereof and the right of each person to direct and govern the conduct of each other person. See ibid. and 23 Illinois Law and Practice, Joint Adventures, pp. 59–65 (1956) and cases cited therein."

It is evident that this interpretation of the Illinois law is of no benefit to plaintiffs; in fact, we agree with the District Court that *Carroll* negates rather than supports plaintiffs' contention.

The fallacy of plaintiffs' reliance upon *Carroll* is further shown by the use sought to be made of it on brief:

> "There the Court held that merely because the parties had entered into an oil unitization agreement, they became joint adventurers. But for the agreement, they would not have been such, and no fiduciary relationship would have existed."

This statement alone points up the distinction between *Carroll*, where the parties had entered into an agreement, and this case, where there was no agreement (or contract). Plaintiffs' misplaced reliance on *Carroll* is further shown by their comparison of the unitization agreement in that case with a franchise agreement. Plaintiffs argue, "There can be no doubt that the franchise relationship was a joint venture * * *," and "Thus, both franchisor and franchisee had an immediate, direct stake in the gross receipts and in the continuing successful operation of the motel."

This argument is based on the false premise that a franchise agreement was entered into between Holiday Inns and plaintiffs. What their relationship might have been if Holiday Inns had granted plaintiffs a franchise or obligated itself to do so is of no consequence.

We have considered all of the points which plaintiffs make on brief in support of their position and think we have sufficiently demonstrated that the case was correctly decided by the District Court. Its judgment is

Affirmed.